# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 8, 2009 Session

## STATE OF TENNESSEE v. JEFFERY BOYD TRUSTY

**Direct Appeal from the Criminal Court for Smith County**
**No. 06-130      John D. Wootten, Jr., Judge**

---

**No. M2008-02653-CCA-R3-CD - Filed April 23, 2010**

---

The defendant, Jeffery Boyd Trusty, was convicted by a Smith County jury of first degree premeditated murder, first degree felony murder, especially aggravated kidnapping, and theft of property over $1000. The trial court merged the two first degree murder convictions and sentenced the defendant to concurrent terms of life imprisonment for the first degree murder conviction, twenty-five years as a violent offender for the especially aggravated kidnapping conviction, and four years as a Range I offender for the theft of property over $1000 conviction, for an effective sentence of life in the Department of Correction. The defendant raises essentially eight issues on appeal, arguing that the evidence was insufficient to sustain the first degree murder and especially aggravated kidnapping convictions, that the State failed to prove venue in Smith County beyond a reasonable doubt and the trial court improperly instructed the jury on the State's burden to prove venue, and that the trial court erred by denying the defendant's requests for special jury instructions, allowing hearsay testimony that the victim feared the defendant, allowing irrelevant and prejudicial evidence about the search procedures employed to locate the victim's body and the evidence uncovered during those searches, allowing a police officer to offer legal opinions and conclusions, allowing irrelevant and prejudicial evidence about the defendant's possession and movement of firearms, and not allowing each of the defendant's counsel to deliver a separate closing argument. Having reviewed the record and found no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

David L. Raybin, Nashville, Tennessee (on appeal); B.F. (Jack) Lowery, J.D. Lowery, and Jeff Cherry, Lebanon, Tennessee (at trial), for the appellant, Jeffery Boyd Trusty.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth T. Ryan, Associate Deputy Attorney General; Tom P. Thompson, Jr., District Attorney General; and Katrin N. Miller, Sharon Reddick, and David Durham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the kidnapping and murder of the defendant's former fiancée, Christina Hunt, whose partially decomposed body, covered with lime, was found buried in rural Smith County on land adjacent to the defendant's. According to the State's proof at trial, in late May 2005, the victim, who had been in a volatile romantic relationship with the defendant, broke off her engagement and fled the state to stay with relatives in Indiana and Texas. The victim returned to Nashville on June 22, 2005, and, in an effort to avoid detection by the defendant, borrowed a friend's vehicle and spent the night at her brother's home. The next day, the victim not only failed to return her friend's car but also missed a scheduled breakfast with her son. A massive search for the victim eventually resulted in the August 4, 2005, discovery of her body in Smith County. The defendant was subsequently indicted by the Smith County Grand Jury for first degree premeditated murder, first degree murder during the perpetration of a kidnapping, first degree murder during the perpetration of a theft, especially aggravated kidnapping, and theft of property over $1000.

## Trial

### State's Proof

At the defendant's November 2007 trial, John Beckett, an area supervisor for McDonald's Restaurants, identified a surveillance videotape that showed that the victim purchased three large cups of coffee at 4:45 a.m. on June 23, 2005 from the drive-through window of a McDonald's Restaurant located on Interstate 440 in Davidson County.

The victim's sister, Susan Bennett, testified that the victim, who had recently broken off her engagement with the defendant, came to visit her at her home in Texas in early June 2005 but left unexpectedly on June 22, 2005. Later that same evening, the victim called Bennett on her cell phone to report that she was driving through Memphis en route back to Nashville. Bennett learned the next day that the victim was missing and responded by going to Tennessee to assist in the search. During the course of that search, she distributed approximately 20,000 missing person flyers, including in Carthage, where she believed the defendant was holding the victim against her will. Bennett testified that the defendant was

-2-

unconcerned and unhelpful when she and her family pleaded with him to let the victim go, telling them only that the victim had left him and he did not know her current whereabouts.

On cross-examination, Bennett testified that the victim had visited relatives in Indiana before coming to see her in Texas. She acknowledged that the victim had broken up with the defendant at least four or five times during the course of their relationship, which began in the fall of 2003, but had never gone missing after any of those previous breakups. On redirect examination, she testified that the victim told her that she had left Tennessee because she was afraid of the defendant.

Loretta Warren, the victim's friend and former sister-in-law, testified that the victim showed up at her Nashville apartment between 9:00 and 10:00 p.m. on June 22, 2005, where the two discussed how the victim would spend the night at the home of her brother, John Warren, who was the witness's ex-husband and lived across the street from the victim's Nashville home. Warren said she suggested that the victim borrow her 1999 Pontiac Sunfire because she believed the victim would be safer driving a vehicle other than her own. The victim agreed and made plans to pick up Warren in time for work the next morning.

The victim had habitually met Warren in the early morning for coffee and cigarettes, and she called Warren between 4:15 and 4:20 a.m. the next day to let her know that she would bring coffee to her home. Warren explained that it would not have been unusual for the victim to purchase three cups, as she and the victim usually drank one cup each and split a third. The victim, however, failed to show up as planned and her cell phone went directly to voice mail each time Warren attempted to reach her that day.

Warren further testified that she regularly stopped in her vehicle at a Mapco store near her home. She identified photographs of her vehicle and said that her insurance company eventually paid her $5000 for its loss.

The victim's twenty-year-old son, Andrew Clinton, testified that the victim and the defendant had a turbulent, on-again, off-again relationship. The defendant gave the victim an engagement ring approximately six months before she disappeared and at one point in the couple's relationship the victim, Clinton, and Clinton's younger brother, Austin Hunt, lived with the defendant at his Smith County home. At the time of her disappearance, however, the victim had her own residence in Nashville and Clinton's uncle, John Warren, had returned the victim's engagement ring to the defendant.

Clinton testified that the victim returned to Nashville on June 22, 2005, and spent the night at John Warren's house, where Clinton lived in a basement apartment. Clinton said that he and the victim argued because he knew she had gone to Texas to get away from the

defendant and he was upset with her decision to return to Nashville. He stated that the victim was driving his aunt's white Pontiac Sunfire in an attempt to "throw [the defendant] off" and was gone by the time he awakened the next day. During the time the victim was out of the state, the defendant came several times to the restaurant where Clinton worked to try to find out the victim's whereabouts, but each time Clinton told him that he did not know where the victim was.

The victim's mother, Wilda Brown, testified that the victim broke off her engagement with the defendant and left Nashville on May 27, 2005, because she was afraid of the defendant. The victim first visited Brown's sister in Indiana and then on June 2 left to visit Bennett in Texas. During the time that the victim was in Indiana and Texas, the defendant came to Brown's home in an attempt to find out where the victim was, but she refused to tell him. The defendant told Brown that he was going to track down the victim, and she replied that it sounded as if he was stalking the victim. In response, the defendant kept repeating in a determined tone of voice his intention of tracking down the victim. On cross-examination, Brown acknowledged that the victim had broken up and reconciled with the defendant several times in the past.

Austin Hunt, the victim's fifteen-year-old son, testified that on June 23, 2005, he drove with his stepmother from Clarksville to Nashville to meet the victim for breakfast, but the victim never showed up.

Detective Mark Webb of the Metropolitan Nashville Police Department testified that he was a patrol officer on June 23, 2005, and responded to Wilda Brown's missing person report on the victim. Brown gave him the name of the defendant as a possible suspect and informed him that he lived in Smith County. He, therefore, contacted a Smith County sheriff's deputy, related the situation, and asked for his assistance.

Tom Agee testified that he was a service team manager for Roadway Express, a transportation trucking company based in Antioch where the defendant was employed in June 2005 as an over-the-road truck driver. He said the company's records reflected that the defendant made a round trip from Nashville to Memphis on June 22-23, 2005, departing Nashville at approximately 12:45 p.m. on June 22, 2005, dispatching out of Memphis at 8:00 p.m., and arriving back in Nashville at 12:02 a.m. on June 23.

Jeffrey Grey, the manager of a Mapco Express store located on Old Hickory Boulevard, testified that Loretta Warren was a regular customer and that he was familiar with her vehicle, which had distinctive rims. He said he was driving to work at approximately 5:00 a.m. on June 23, 2005, when he saw Warren's vehicle parked behind a BP station down the street from his store, which struck him as strange. He was unable to tell if anyone was

-4-

in the vehicle because the windows were tinted and the area was not well-lit. There were no other vehicles in the parking lot at that time, and when he left work at 3:00 p.m. that day, the vehicle was no longer there.

Homer Webb testified that in June 2005, he lived in a farmhouse on Cedar Lane in Smith County, which was owned by the defendant's brother, William Trusty. The defendant showed up at the property at approximately 8:00 a.m. on June 23, 2005, driving a Ford dually pickup truck, told him that he was looking for a set of ramps to use to move a shed, searched in a garage, and left after ten or fifteen minutes. Webb saw the defendant's truck at an outlying barn on the property later that afternoon but could not tell who was driving, as it departed when he walked outside into the yard.

John Lindberg, an employee of Roadway Express, testified that the defendant called him on June 23, 2005, to ask him to go to lunch. When he met the defendant shortly before noon in the employee parking lot, he noticed scratches on the defendant's face, which the defendant explained as the result of his having fallen off a horse into some briars. The defendant covered his face as they walked past the garage, and when he asked him why, told him that he had called in sick that day and did not want anyone to see him. They left for lunch in Lindberg's vehicle and, en route, the defendant suggested that they drive to the Burger King on Bell Road, telling him that his jeep had broken down there. However, when they reached the restaurant and Lindberg started to take out his jumper cables, the defendant told him that he had already repaired the jeep, that he had a lot of things to do, and that he did not want to eat lunch after all.

Lindberg testified that when he learned on Friday of the victim's disappearance, he called a tip line to report what he knew to the police. The next day, the defendant came to his house and asked him not to tell the police that he had given him a ride to his jeep, but to instead lie and say that he had helped him unload his motorcycle off his trailer. On July 4, the defendant showed up at his house again and told him that if anyone testified against him and he was in jail, he had friends who would "take care of that." Lindberg testified that two or three weeks before the victim disappeared, he and the defendant were at a bar when the defendant told him that he would kill the victim and himself if the victim ever left him because the victim was "the best piece of ass" he had ever had and he loved her.

The defendant's brother, William Trusty, testified that he was an employee of the Smith County Sheriff's Department and lived on Rome Road in Smith County, where the defendant, his mother, and his grandmother also lived in 2005. He said the defendant came to his house at approximately 7:00 a.m. on June 23, 2005, to find out where the ramps to his trailer were. Trusty testified that the trailer to which the defendant referred was his sixteen-foot ball hitch trailer, which he normally kept beside his grandmother's house on Rome

Road, and that the ramps, which were used to load vehicles on the trailer, were kept in a garage located on the family farm on Cedar Lane.

Trusty testified that he was on his way to Goodlettsville at about 5:00 that afternoon when he saw the defendant driving toward Carthage in his Ford pickup truck while towing the trailer. At approximately 7:30 or 8:00 that same evening, he spotted a vehicle "down in the bottom" below his grandmother's house, investigated, and discovered the defendant beside his truck, which was no longer towing the trailer. The defendant told him that he was deer hunting, but Trusty did not see any weapon.

Trusty testified that after he had returned home, he received a call from Sergeant Mark West of the Smith County Sheriff's Department, who asked him to find out if the defendant knew where the victim was. He said he first checked the defendant's home and then drove to the back of the defendant's property to see if the defendant was still hunting. Not seeing anyone, he turned around, saw lights near the garage, and found the defendant near an old road that led to the property of a neighbor, Walter Beasley. He asked the defendant what he was doing, and the defendant told him that he was coyote hunting. He then asked the defendant if he knew where the victim was, and the defendant said he did not. Trusty identified various photographs of the area, including the old road beside the defendant's house that led to Walter Beasley's property and a parcel of land behind the defendant's property that belonged to Jimmy Joe Boze.

Tammy Self, the defendant's ex-wife, testified that sometime in the early afternoon of June 23, 2005, the defendant stopped at the end of her mother's driveway to give a birthday card and gift to their younger son. The defendant was driving his Ford extended cab, dually pickup truck and towing a trailer, and she saw him only from a distance. The next day, which was Friday, he came uninvited to their son's birthday party and asked her to rent a storage building in Lafayette for him, telling her that he needed to store his belongings where no one would know about it except for himself, his brother, and the witness. Self said that she refused to do so, both on Friday and again the next day when the defendant repeated his request. The defendant had red finger marks on his face when she saw him on Friday, and the following day he was wearing the same clothes and had dirt on the back of his shirt.

Tyler Trusty, the defendant's sixteen-year-old son, testified that on Saturday, June 25, 2005, he noticed red marks on the defendant's face and overheard him saying that he had fallen off an ATV. He said the defendant took him and his brother to his house on Rome Road that day, where he had them wash his mud-covered ATV while he took a shower. He saw the defendant when he got out of the shower and noticed that he also had red marks or scratches on his shoulders and chest.

Paul Garrett, a long-time friend of the defendant's, testified that the defendant came to his Lafayette home at about 9:30 a.m. on June 23, 2005, towing a trailer that was carrying a white-colored, tarp-covered vehicle. He said that the defendant asked him to rent a storage unit for him, telling him that the car was a Saturn that he planned to repair in the storage unit and give to his son, but that he did not want Tammy Self to learn of the project. Garrett stated that the defendant gave him money and went with him to a storage facility in Lafayette, where Garrett rented the storage unit for the defendant in Garrett's name.

Garrett testified that he grew suspicious the following Sunday when he learned that the defendant had also asked Tammy Self to rent a storage unit for him. He, therefore, went to the rented storage unit with a friend, cut the lock, and found inside a suitcase, a large purse, and a vehicle that was not a Saturn. Believing that the vehicle was stolen, he called the defendant and demanded that he remove it from the storage unit. He and his friend remained in town, and a little after midnight on Monday, June 27, they saw the defendant at a service station, trailer in tow, getting fuel for his truck. After circling around town, they drove back by the storage facility and saw the defendant pulling in behind the storage unit. When Garrett checked the next morning, the unit was empty.

A few weeks later, the defendant came to Garrett's house and told him that the victim was in Mexico, that she had his money, and that the two were supposed to meet but he had not heard from her. Garrett had spoken to Metropolitan Nashville Police Detective Brad Corcoran the previous day, but he did not let the defendant know that he had. Instead, he told the defendant only that the police wanted to talk to him. In response, the defendant gritted his teeth and said that Garrett did not have to tell the police anything.

Teresa McCormick, who in June 2005 worked at Turner's Citgo on Gordonsville Highway in South Carthage, testified that the defendant came into the store to buy beer approximately one week after she had taped the victim's missing person flyer to the counter, placed his hand on the flyer, and "took his thumb like he was trying to dig [the victim's] picture off the poster."

Officer Erik Nash of the Metropolitan Nashville Police Department, who was a trainee at the Metropolitan Police Academy in August 2005, testified that on August 4, 2005, he and the other members of his class were searching for the victim's remains in a wooded area in Smith County when he noticed a rotting smell, saw an unnatural looking pile of rocks covered with a blue-green powder, moved one of the rocks, and discovered a blackish-colored human finger sticking up out of the middle of some powder.

Homicide Detective Brad Corcoran of the Metropolitan Nashville Police Department, the lead detective assigned to the case, testified that in a June 24, 2005, telephone

conversation, the defendant told him that he last had seen the victim on May 26, last spoken with her on June 13, and had no knowledge of her whereabouts. The defendant suggested, however, that the victim might be in Mexico, telling Detective Corcoran that he and the victim had made plans to go to Mexico in the future and that the victim might have already gone.

On the afternoon of Monday, June 27, 2005, Detective Corcoran, Tennessee Bureau of Investigation ("TBI") Agent Jason Winkler, and Investigator Joe Jones of the Fifteenth District interviewed the defendant in person at his home on Rome Road in Smith County. During that conversation, the defendant said that the victim was supposed to marry him on June 4 but left his house unannounced on May 26 and refused to discuss their marriage plans during the last phone conversation he had with her on June 13. The defendant reported that he had arrived home from work at 1:30 or 2:00 a.m. on June 23, 2005, completed some chores, was bucked off a horse and injured, worked on his four-wheeler, retrieved some ramps from his brother's house, and transported his motorcycle to a motorcycle shop. The defendant additionally stated that his relationship with the victim had been rocky, that the victim had accused him of domestic violence in Wilson County, and that the victim had taken out two orders of protection against him but that he had paid her $500 each to drop them. Finally, the defendant explained the visible scratches on his arms, neck, and face as the result of the horseback riding incident.

Detective Corcoran testified that after interviewing Paul Garrett, he went to the storage unit in Lafayette in Macon County, where he discovered some charred debris, including a piece of plastic that was consistent with a tarp. He said that the investigation eventually changed from a missing person to a homicide case and that he obtained search warrants for the three parcels of land on Rome Road owned by the Trusty family and consent from the owners of thirty to forty neighboring tracts in order to conduct a ground search of the area. The military performed a preliminary search on June 2, 2005, to identify the type of terrain and the best methods to be employed in the search, and on June 3, 2005, a large, systematic search involving over 300 military and police personnel began.

Detective Corcoran identified various photographs of the search, including the burial site located on Jimmy Joe Boze's property, the excavation of the remains, the old logging road that ran beside the defendant's house, and an old lime pit located within a quarter-mile of the burial site. He additionally identified photographs of the clothing the victim was wearing at the time her body was discovered, the BP station where Grey saw Loretta Warren's white Pontiac parked early on the morning of June 23, and the Burger King restaurant where Lindberg dropped off the defendant in the early afternoon of the same day.

Detective Corcoran testified that the victim's body was clothed in capri-style, blue-jean overalls and a pink pullover top, which was consistent with the pink top the victim was wearing in the McDonald's surveillance videotape. He said that the victim's body was not wearing any socks and that a small, partially burned white sock was recovered from a fire pit on the defendant's property on August 3, 2005. He further testified that the distance from the Burger King restaurant to where Warren's car had been parked in the BP service station lot measured 336 yards and that the BP station was less than 100 feet from Loretta Warren's apartment.

Identifying on a map the relevant areas in the case, Detective Corcoran testified that it took approximately forty to forty-five minutes to drive from the area in Nashville marked on the map to the area in Carthage, thirty minutes from Rome Road to Lafayette, and forty-five to fifty minutes from Lafayette back to Nashville. He stated that at the time the defendant was being booked for the victim's murder, he made a spontaneous statement that "he didn't mean for this to happen" and that "[h]e just didn't know what to do." He said that on November 30, 2005, he received a call from defense counsel's office informing him that Loretta Warren's vehicle was located on the square in Lebanon adjacent to counsel's office. He then went to that location and recovered the vehicle, which was missing its tags.

On cross-examination, Detective Corcoran acknowledged that the first indictment returned against the defendant charged him with the crimes in Davidson County. He further acknowledged that he did not know if or where the victim had been killed or kidnapped. On redirect examination, he testified that evidence that the victim was kidnapped, murdered, and her car stolen was presented to both the grand jury of Davidson County and to the grand jury of Smith County, and he clarified his cross-examination testimony by stating that he did, in fact, know that the victim had been killed. On recross-examination, he acknowledged that he did not know where the victim was killed or how she was killed and that he had no eyewitness or photographic proof that she had been abducted.

Dr. Michael Phillip Tabor, an expert in forensic dentistry who compared the victim's dental records to the teeth of the body found buried in Smith County, opined that the remains were those of the victim.

Frances Wheatley, the lead investigator for the Davidson County Medical Examiner's Office who participated in the recovery of the victim's body, testified that a traditional autopsy was unable to be performed because the partially skeletonized remains did not contain any internal organs.

Dr. Hugh Berryman, an expert in the field of forensic anthropology, testified that he found fractures to the victim's nose and multiple fractures to the left side of her mandible,

which were reflective of blunt force trauma applied to the lower part of her face. He opined that some of the blunt force trauma could have been caused by a fist, but that one of the fractures in which the bone was notched was suggestive of a penetrating injury to the soft tissue, which had to have been caused by some type of instrument. Although he was able to determine that the injuries occurred around the time of the victim's death, he was unable to determine whether they were pre- or post-mortem. On cross-examination, he acknowledged that he was unable to determine the cause of death, and he conceded that some of the fractures could have been caused post-mortem by rocks dropped or thrown on the left side of the victim's face.

Metropolitan Nashville Police Officer William Kirby of the Crime Scene Identification Division testified that he processed the 1999 Pontiac Sunfire on December 1, 2005, and found that it had been wiped clean and had no unusual items inside it.

TBI Special Agent Jason Wilkerson testified that the defendant consented to a search of his home on June 27, 2005, and told him, when asked, that he had guns but had moved them to his mother's home because he did not want the officers to find them at his residence. He said there was no evidence that any of the guns were involved in the victim's disappearance.

**Defendant's Proof**

Steven Dill, an employee of Boswell Harley Davidson in Nashville, identified a repair order that reflected that the shop took the defendant's motorcycle in for an oil change on June 23, 2005. On cross-examination, he testified that he had no independent recollection of the transaction.

The defendant testified that his relationship with the victim had been turbulent, explaining that he and the victim sometimes got along but also had issues that at times led to heated arguments. He related their series of breakups and reconciliations and testified that in April 2005, the victim was living in her own apartment in Nashville but that the two had reconciled and were engaged to be married. He stated that he thought their relationship was still going well when he dropped the victim off at her apartment after she had spent the night at his home, and became worried when she would not answer his subsequent telephone calls. The victim's mother and son could not tell him her whereabouts, but the victim's brother finally informed him that the victim was uncertain about the marriage and that the brother was sending the engagement ring back to the defendant. The defendant said the next time he heard from the victim was when she called him on June 13 while he was on the road.

-10-

The defendant testified that he drove a load to Memphis on June 22, 2005, and returned to Nashville, clocking out at five or ten minutes after midnight on June 23. He then hung out in the driver's lounge for a couple of hours before carrying his gear out to his jeep, where he found a note from the victim asking him to meet her at the Waffle House on Old Hickory Boulevard at 5:00 a.m. After stopping to purchase fuel, a soda, and cigarettes, he drove to the Waffle House, located next door to the Burger King, and parked his vehicle. A few minutes later, the victim pulled up in Loretta Warren's vehicle, motioned him into the vehicle, and handed him a cup of coffee. She then drove to the BP station, parked the vehicle, and began talking.

The defendant testified that the victim told him that she had left to clear her head and returned because she intended to go to school. The victim then asked him to give her $700, telling him that she needed some money to get her started. He refused, and the victim became enraged, called him "a sorry SOB," threw her cup of hot coffee in his face, and began hitting and scratching him and pulling his hair. The defendant stated that he pushed forward to get the victim off him and ended up on top of her in the backseat. At that point, he noticed that she was no longer moving. He described the episode:

> She just started screaming at me and took her hot coffee and threw it on me in my face, and it blinded me, and I grabbed my shirt that I had on and pulled it up over my face and was trying to wipe my eyes out, and at that time, she started hitting on me and pulling my hair and scratching me, and she just wouldn't stop hitting me, and I had nowhere to go. I was backed up against the back of the door with my back, and she was on top of me pretty much holding my head and my hair, and I couldn't get her to quit and took and pushed forward on her, pushed forward and tried to knock her off of me, and I just pushed real hard, and we flew between the seats and landed up in the back of the back seat, and I was on top of her looking up at the roof, and I noticed that she had quit moving. She was just limp there. I took and got up off her and got situated around and tried to see what was wrong with her, and she wasn't moving.

The defendant testified that he attempted CPR on the victim but was unable to get any response. In a state of shock, he initially began walking down the road, but, unable to leave the victim "there like that," he returned to the vehicle, covered the victim with a quilt, and began driving to his home in Smith County, following the shortest route. The vehicle began to run out of gas as he was driving through Hartsville, so he pulled behind an old tobacco barn, raised the hood, locked the doors, and hitched a ride home. Once there, he retrieved his truck, the trailer ramps, the trailer, and five gallons of fuel, returned to the vehicle, filled its tank, and drove it onto his trailer. He then carried the vehicle on the trailer to Lafayette,

where Garrett rented the storage unit for him.

The defendant testified that he put the vehicle in the storage unit, moved the victim to the backseat of his truck, drove home, and placed the victim on a bed in his house. He then drove to the Roadway Express parking lot, obtained a ride from Lindberg to the Waffle House where he had left his jeep, and drove back to Roadway Express, where he discovered that his jeep was too large to fit on the trailer. He, therefore, drove his jeep home, rode his motorcycle back to Roadway Express, loaded the motorcycle onto the trailer, and dropped off the motorcycle at the motorcycle shop. Next, he drove the truck and trailer back to Carthage, dropped the trailer at his grandmother's rental house, returned to his home, placed the victim's body in his truck, drove to the back of his property, and carried the victim down to the area where her body was found.

The defendant testified that he did not call the police because he panicked. He said he had made some bad choices, but he did not kidnap the victim and never intended to kill her. On cross-examination, he testified that Hartsville is in Trousdale County and that he therefore never crossed the county line into Smith County with Warren's vehicle. He said that he used a five-gallon bucket and his four-wheeler to place lime on the victim's body on June 24, 2005, removing a couple of rocks from the pile he had placed on the victim the previous day and then replacing them afterwards He stated that when he was covering the victim's body with rocks, a large one slipped from his hands and fell onto her face.

At the conclusion of the defendant's proof, the trial court granted the State's motion to dismiss count three, which charged the defendant with felony murder in the perpetration of theft.

### State's Rebuttal Proof

Loretta Warren testified that her 1999 Pontiac Sunfire, a small two-door car with "pretty good" gas mileage, contained a half-tank of gas at the time the victim borrowed it. On cross-examination, she acknowledged that she did not know where the victim drove when she left her home.

Following deliberations, the jury convicted the defendant of the four remaining counts charged in the indictment.

### ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence for his first degree murder and especially aggravated kidnapping convictions. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. First Degree Premeditated Murder

To sustain the conviction for first degree premeditated murder, the State had to prove

beyond a reasonable doubt that the defendant committed "[a] premeditated and intentional killing" of the victim. Tenn. Code Ann. § 39-13-202(a)(1) (2003 & 2006). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The defendant argues that there was "not one shred of evidence" that the killing was premeditated and no proof that he caused the victim's death. The State responds by arguing that there was abundant evidence to show that the defendant killed the victim with premeditation, including proof, among other things, of his tumultuous relationship with the victim, his declared intent to kill her if she ever left him, the efforts he made to locate her after she left the state, his failure to seek any assistance for her at the time of her death, and the elaborate steps he took to conceal the crime. We agree with the State.

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

Viewed in the light most favorable to the State, the evidence established that the defendant had a history of domestic violence toward the victim, stated his intention of killing her if she ever left him, attempted to discover her whereabouts after she broke off their engagement and fled the state, and repeatedly announced to her mother his intention of

-14-

tracking her down. The evidence further established that the victim had expressed her fear of the defendant and, at the time of her disappearance, was taking steps to prevent him from locating her; that the victim sustained multiple fractures to her jaw and nose around the time of her death, including a fracture caused by some type of instrument; and that the defendant appeared calm and went to elaborate efforts to dispose of the victim's body and to conceal evidence of the crime rather than seeking immediate medical assistance or reporting her alleged accidental death to the police. From all of this proof, a rational jury could have found beyond a reasonable doubt that the defendant killed the victim intentionally and with premeditation. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for first degree premeditated murder.

## B. First Degree Felony Murder and Especially Aggravated Kidnapping

The defendant argues that the evidence was insufficient to sustain his especially aggravated kidnapping and first degree murder in the perpetration of a kidnapping convictions because "there was absolutely no evidence that [the victim] was ever kidnapped by anyone." The State argues that it presented sufficient circumstantial evidence to establish that the defendant confined the victim in her vehicle against her will and that she died at some point during her confinement. We, again, agree with the State.

To sustain the conviction for first degree felony murder, the State had to prove beyond a reasonable doubt that the defendant killed the victim "in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2) (2003 & 2006). To sustain the conviction for especially aggravated kidnapping, the State had to prove beyond a reasonable doubt that the defendant committed a kidnapping of the victim where the victim suffered serious bodily injury. Id. § 39-13-305(a)(4). Kidnapping is defined as "false imprisonment . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury." Id. 39-13-303(a)(1). "False imprisonment" is committed when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. 39-13-302(a).

The defendant asserts that there was no proof that the victim was kidnapped. The State, however, presented evidence at trial to show that the victim had fled the state because she feared the defendant and that she took steps upon her return to avoid his detection by borrowing a friend's car and staying in her brother's home. Based on this evidence, a rational jury could have reasonably found that she did not invite the defendant into her car or willingly accompany him anywhere, but that the defendant instead knowingly removed or confined her against her will and that he caused her death during the course of that removal or confinement. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for first degree felony murder and especially aggravated

-15-

kidnapping.

## II. Venue

The defendant next contends that the State failed to prove venue in Smith County by a preponderance of the evidence and that the trial court issued erroneous instructions to the jury on the State's burden to prove venue. Specifically, the defendant argues that "[t]here was no evidence, direct or circumstantial, to establish that any crime occurred in Smith County." He further argues that the trial court's instructions on venue, which stated that the jury may infer that a murder was committed in the county where the body was found, unconstitutionally shifted the burden of proof from the State to the defendant.

The Tennessee Constitution provides criminal defendants with the right to a jury trial in the county where the offense was committed. Tenn. Const. art. I, § 9; State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006). Accordingly, "[a]lthough venue is not an element of the crime, the [S]tate must prove by a preponderance of the evidence that the offense was committed in the county alleged in the indictment." State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997) (citations omitted); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."); Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed.").

"Venue is a question for the jury," Young, 196 S.W.3d at 101 (citing State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984), and can be established by circumstantial evidence. Id. at 101-02 (citing State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977)). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. Id. at 102 (citing State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)).

At trial, defense counsel made a general objection to the State's special instruction as to venue. The State's request included the instruction that the jury "may infer" that the "murder was committed in the county where the body was found." The trial court included the State's special instruction, instructing the jury as follows:

The burden of proof venue, generally. The burden is upon the State to prove by a preponderance of the evidence that this offense was committed in Smith County, Tennessee. Proof by a preponderance of the evidence means that the greater weight of the evidence must be in support of the State's contention. Venue of the offense lies in the county where the offense was commenced or consummated. If you find that the State has failed to prove by

-16-

a preponderance of the evidence that this offense was commenced or consummated in Smith County, Tennessee then you must return a verdict of not guilty.

The burden is upon the State to prove by a preponderance of the evidence which may be either direct, circumstantial, or both if the offense was committed in Smith County, Tennessee. Proof by a preponderance of the evidence means that the greater weight of the evidence must be in support of the State's contention.

Venue of the offense lies in the county where the offense was commenced or consummated. If one or more elements of an offense are committed in one county and one or more elements in another, the offense may be prosecuted in either county. You may infer that a murder was committed in the county where the body was found.

If you find that the State has failed to prove by a preponderance of the evidence that this offense was commenced or consummated in Smith County, Tennessee then you must return a verdict of not guilty.

Preponderance of the evidence simply means the greater weight of the evidence which is not determined alone by the greater number of witnesses testifying one way or another about the issues sought to be proved but the preponderance is that evidence which to your mind has the greater and more persuasive force and which you believe more closely details the factual truth.

Evidence is whatever has been admitted by the Court during the course of this trial for you, the jury, to see, hear or examine.

In this cause the State has the burden of establishing by a preponderance of the evidence all the facts necessary to prove the following issue, that venue of the offenses is in Smith County, Tennessee. The burden of proving an issue by a preponderance of the evidence has not been met if the evidence on that issue appears to be equally balanced. You must consider all the evidence pertaining to this issue regardless of who presented it.[1]

The defendant contends on appeal that the trial court erred by instructing the jury that it "may infer that a murder was committed in the county where the body was found,"arguing

---

[1]There is some repetition in this instruction.

that such an instruction is unconstitutional in that it "shifts the burden of proof to the defendant and there is no rational or logical basis upon which this so-called inference is based." We respectfully disagree, as the trial court included this additional instruction as to inference in its instructions to the jury:

> The Court has charged the jury concerning an inference that the jury may make in regarding to certain evidence in this case, however[,] the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in the case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the [S]tate or is offered by the defendant.
>
> Although the defendant is not required by law to do so when the defendant offers an explanation to rebut the inference raised, you should consider such explanations along with all the evidence to determine not only the correctness of the inference but also the reasonableness of the defendant's explanation. You aren't bound to accept either the inference or the defendant's explanation. The statements have proven beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

In State v. Pickett, 211 S.W.3d 696, 701 (Tenn. 2007), our supreme court considered the constitutionality of the following inference set out in Tennessee Code Annotated section 39-17-1003(b) (2003) for cases involving the sexual exploitation of a minor: "In a prosecution under this section, the trier of fact may infer that a participant is a minor if the material through its title, text, visual representation or otherwise represents or depicts the participant as a minor." The defendants in Pickett argued that subsection (b) "impermissibly shift[ed] the burden to the defendant to prove that the images do not portray actual minors." 211 S.W.3d at 702. The court disagreed, explaining that the inference was permissive rather than mandatory:

> [I]t is our view that the statute does not impermissibly shift the burden to the defendant to prove that the image does not depict a minor. Both this Court and the United States Supreme Court have specifically approved of the use of permissive inferences in criminal trials. See, e.g., Estelle v. McGuire, 502 U.S. 62, 78-79, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); Lowe v. State, 805 S.W.2d 368, 371-72 (1991); State v. Bolin, 678 S.W.2d 40, 42 (Tenn. 1984). In Estelle, the United States Supreme Court held that "a permissive inference is not a violation of due process because the State still has the burden of persuading the jury that the suggested conclusion should be inferred based on

the predicate facts proved." Estelle, 502 U.S. at 79, 112 S. Ct. 475 (citing Ulster County Court v. Allen, 442 U.S. 140, 157-63, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979)). A "permissive inference allows, but does not require, the triers of fact to infer the elemental fact from proof by the State of the basic fact and places no burden of any kind on the defendant." Bolin, 678 S.W.2d at 42.

Conversely, a mandatory presumption violates due process because it shifts the burden to the defendant. Patterson v. New York, 432 U.S. 197, 215, 97 S. Ct. 2319 (1977). "The mandatory presumption tells the triers of fact that they must find the elemental fact upon proof of the basic fact unless [the] defendant comes forward with some evidence to rebut the presumed connection between the two facts." Bolin, 678 S.W.2d at 42.

In this instance, Tennessee Code Annotated section 39-17-1003(b) provides that "the trier of fact *may infer* that a participant is a minor if the material through its title, text, visual representation or otherwise represents or depicts the participant as a minor." Tenn. Code Ann. § 39-17-1003(b) (2003) (emphasis added). The statute does not require the trier of fact to conclude that the material depicts a minor. Further, the statute places no burden on the defendant to prove that the image is not that of a minor. The State must still establish each of the elements of the crime, including the fact that the material contains the image of a minor. It is our view, therefore, that the statute does not unconstitutionally shift the burden of proof.

Id. at 703.

The inference regarding venue in the present appeal, similar to the inference regarding the age of the participant in Pickett, was permissive rather than mandatory. Accordingly, we conclude that the State's special instruction as to venue did not shift the burden of proof to the defendant.

The defendant additionally argues that the inference was improper because it was not based on statute, as in other states, but rather was judicially created. In Reynolds v. State, 287 S.W.2d 15, 16 (Tenn. 1956), our supreme court held that "there must be a presumption, . . . rebuttable in character, that the crime was committed where the body was found when there is no showing to the contrary." Relying on that language, the defendant in Cagle v. State, 507 S.W.2d 121, 131 (Tenn. Crim. App. 1973), argued "that the court erred in failing to instruct the jury that there is a presumption the deceased was killed in the county where her body was found." The Cagle court, however, explained why such an instruction was not required in that case:

-19-

In this case, as noted, there is evidence from which the jury could justifiably find that the crime was committed partially in both Hamblen and Jefferson Counties. Consequently, the defendant was not prejudiced by the court's failure to charge the jury this homicide victim was presumed to have been killed where her body was found.

Id.

Thus, by implication, the Cagle court held that such an instruction would be appropriate in certain cases.

The defendant additionally argues that the jury could not properly have made the presumption that the victim died in Smith County because the defendant presented "direct evidence to the contrary," namely, that the victim was neither moving nor breathing while she was in the backseat of her car in Davidson County. The defendant summarizes his argument as follows: "[T]he lead investigating detective testified that the government was unable to prove the cause of death of the victim, whether it was even a homicide, was unable to establish where the victim was killed, whether the victim was even kidnapped or not, whether the victim was killed in perpetration of any theft or any kidnapping."

The State responds by arguing that the defendant did not rebut the presumption that the victim died in Smith County:

The defendant testified that the victim was not moving or breathing after the two had struggled in the white car, while it was parked behind the BP station. Though he may have [implied] through his testimony that he killed the victim in the car, he never testified that he killed her.

By its verdict, the jury clearly rejected the defendant's tale. And without the defendant's testimony, the jury was presented with proof that the victim was alive in Davidson County the last time she was seen [alive] and the proof of her death was found under a pile of rocks in Smith County.

We agree with the State that it is apparent by its verdict that the jury made the presumption that the victim died in Smith County. Despite the defendant's assertion that his trial testimony was that "the victim died in Davidson County," the record shows that the defendant in fact testified merely that the victim was not breathing and did not respond to his attempts at CPR while she was in her car in Davidson County.

The jury was, moreover, entitled to disbelieve any implication contained in the

defendant's testimony that the victim died in Davidson County. In <u>State v. Beall</u>, 729 S.W.2d 270 (Tenn. Crim. App. 1986), cited by the State, this court concluded that the jury was entitled to disbelieve the defendant's testimony that he had killed his wife in Kentucky rather than in Montgomery County, where her body was found:

> In <u>Reynolds v. State</u>, 287 S.W.2d 15 (Tenn. 1956), the Supreme Court held that the finding of a body in the county of trial created a presumption the killing occurred in that county and the jury could so find on the question of venue. Although the question raised in this matter is not one of venue in a particular county but one of territorial jurisdiction in Tennessee, we see no reason to hold that the finding of the body in Montgomery County, Tennessee, would not give rise to a presumption that the killing occurred in this state.

> The defendant contends that such a presumption is invalid in this case because of his positive testimony that he shot his wife in Kentucky. The argument has validity only if his testimony is accepted as true in the face of evidence to the contrary. This, of course, is not the manner in which such issues are resolved.

> Whether the defendant established the killing occurred in Kentucky or whether the killing occurred in Tennessee was a factual matter to be resolved by the jury after hearing all the testimony of the witnesses, weighing their credibility, and applying to the facts the law as given them by the trial judge.

> The jury has accepted the state's theory on the location of the shooting and rejected the defendant's theory thereof. . . .

<u>Id.</u> at 271.

We conclude, therefore, that the State presented sufficient evidence to support the jury's determination that the victim died in Smith County.

Finally, the defendant relies on the holding in <u>Henderson v. State</u>, 539 S.W.2d 843 (Tenn. Crim. App. 1976), to argue that just because language appears in the text of an appellate opinion, it does not mean that it is appropriate to be included in the charge to the jury. The instruction to which the defendant objected in the <u>Henderson</u> case was quoted from the opinion in <u>Crosswy v. State</u>, 157 Tenn. 363, 371, 8 S.W.2d 486, 488 (1928), and stated as follows:

If one will use an intoxicant, he must remember that organized society speaking through the legislative department of this State has inhibited him from driving while under the influence of intoxicating liquor any automobile, motorcar, taxicab, or motorcycle in the State of Tennessee and especially prohibits the driving of an automobile by any person on the public highways of Tennessee while such person is under the influence of an intoxicant. Such person has no right to speculate as to the extent of the potency of the intoxicant he has taken or as to his powers of resistance. If he would avoid the penalty which the law imposes for violation of its command, common prudence would suggest that he refrain from experimenting as to his ability to overcome the influence of the intoxicant he has used. The statute must be obeyed.

Henderson, 539 S.W.2d at 847.

The Henderson Court concluded that the instruction was error, albeit harmless, because it was not supported by the facts and was not appropriate as a standard upon which the jury should make its determination:

A close review of the Crosswy opinion indicates that the language here quoted from it is dictum and, taken in context, was merely supportive of the Crosswy's court's conclusion that the evidence as a whole did not preponderate against the jury's verdict of guilt. The statement may not be wrong when viewed as a principle of appellate review, but it is not altogether appropriate as a legal standard by which a jury should decide the defendant's guilt or innocence.

Id. at 848-49 (footnote omitted).

In contrast to the court's holding in Henderson, we do not find that the instruction the jury could make the permissive inference that the victim died in the county where her body was found to be either stating a principle more suited for appellate review or an inappropriate legal standard for the jury to utilize in making its determination. Accordingly, we conclude that this issue is without merit.

### III.  Special Jury Instructions

The defendant next contends that the trial court erred by not granting his request for special jury instructions that transporting or burying a body after death is not an element of the offense of homicide and that a homicide is consummated and completed when death occurs.  In the body of his brief, the defendant additionally contends that the trial court erred

by not instructing the jury that a person must be alive in order to be kidnapped. The State points out that the trial court granted the special jury instruction on kidnapping and argues that the trial court properly denied the defendant's other requested special jury instructions on the basis that the pattern jury instructions adequately set out the elements of the offenses of premeditated and felony murder.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

We agree with the State that the trial court's instructions, which accurately set out the required elements for first degree premeditated and felony murder, fully and fairly stated the applicable law. We note that defense counsel admitted that he had no case law in support of the proposed jury instruction on transporting a dead body but instead had drafted it himself. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

### IV. Hearsay Testimony

The defendant next contends that the trial court erred in admitting hearsay testimony from Bennett and Brown that the victim feared the defendant. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). Accordingly, we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion.

The trial court admitted the challenged testimony under the state of mind exception to the rule against hearsay, finding that the statements were reflective of the victim's then-existing state of mind and relevant to show the relationship between the victim and the defendant during that window in time. Following the first hearsay statement admitted, the

trial court also issued a limiting instruction to the jury to the effect that it was not to consider the statement as proof of the defendant's or anyone else's conduct, but only as indicative of the victim's state of mind at the precise moment she uttered the statements.

We conclude that the trial court properly admitted the testimony under the state of mind exception to the rule against hearsay, but that its limiting instruction was unnecessarily restrictive. The state of mind exception provides for the admission of a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Tenn. R. Evid. 803(3). The Advisory Commission comments to the rule explain that "[c]ombining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue *or subsequent conduct consistent with that mental state*," but that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Id., Advisory Comm'n Comment (emphasis added).

As further explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 8.08[5][a] (5th ed. 2005):

> Once we accept the settled proposition that declarations of mental state are admissible to prove the declarant's mental state at that time, it follows under relevance principles that consistent contemporaneous or future conduct can likewise be proved by such declarations of mental state. In other words, if a person has a mental state that suggests conduct would be forthcoming because of that mental state, the existence of that mental state can be used as some proof that the conduct occurred.

Declarations of mental state can also be used to prove the declarant's past or future mental state:

> It only takes application of the traditional definition of relevance in Rule 401 to conclude that a declarant's expression of his or her present mental state is admissible to prove that the declarant had the same mental state on a later date or at an earlier time. The boundaries are those of common sense and probability.

Id. § 8.08[4].

Given the proof of the on-again, off-again nature of the victim's relationship with the defendant, we conclude that the statements she made shortly before her death about her fear of the defendant were relevant and admissible under the state of mind exception to show not

only her state of mind at the time she uttered the statements, but also her probable mental state and behavior at the time of her death, including whether she would have been likely to initiate contact with the defendant or willingly accompany him in her vehicle. The defendant is not, therefore, entitled to relief on the basis of these claims.

## V. Evidence Related to Search for Victim's Body

The defendant next contends that the trial court erroneously admitted irrelevant and prejudicial evidence related to the search for the victim's body; specifically, Officer Nash's testimony about the procedures used to search for the victim, the partially-burned sock found in the fire pit, Detective Corcoran's testimony about the various places that were searched, and photographs of the burial site, buckets of dirt, and rocks. The State responds by arguing, *inter alia*, that the evidence was properly admitted on the basis that its probative value on the issue of premeditation outweighed any prejudicial effect. We agree with the State.

### A. Testimony of Police Officers

The defendant first complains about Officer Nash's description of the "grid pattern" employed in the search and Detective Corcoran's testimony about the various places in which officers unsuccessfully searched for the victim. The defendant argues that such testimony was irrelevant, "proved nothing," and "was designed to prejudice the defendant by showing some massive police effort to locate the alleged victim." We agree with the State, however, that the officers' testimony served to show how well the victim's body was hidden and was therefore relevant to the issue of premeditation. We further agree that the probative value of the evidence outweighed any prejudicial effect. We conclude, therefore, that the trial court did not err in admitting the testimony.

### B. Crime Scene Photographs

The defendant takes no issue with the admission of photographs depicting the victim's body at the burial site but complains that photographs of the site without the victim's body, "of buckets of dirt which did not even have the body in it," and of rocks "when there was no evidence that the rocks were relevant to anything," were unfairly prejudicial to his case. We respectfully disagree.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788,

810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The photographs at issue, which were part of a series introduced during the testimony of Detective Corcoran, showed the remote and wooded location in which the body was found, the natural rock formations in the area and the individual rocks that had been placed on the body, and the procedures employed in the recovery of the remains. During their introduction, Detective Corcoran testified, *inter alia*, that the vegetation was dense, that there was no trail or foot path that led down to the area where the body was located, and that the recovery of the remains included removing the topsoil by hand, placing it in buckets, and carrying it to "an environment that would be more advantageous to be able to remove or recover any artifacts that may be in this soil." We, therefore, agree with the State that the photographs were relevant and admissible to show the appearance of the crime scene, including the great lengths to which the defendant went to conceal the body, which helped to support the State's theory that the defendant premeditated the killing. We further agree that the probative value of the evidence outweighed any prejudicial effect.

## C. Burned Sock

Finally, the defendant cites State v. Cannon, 254 S.W.3d 287 (Tenn. 2008), to argue that the trial court erred in admitting evidence of the partially burned sock found at the fire pit because there was "absolutely no evidence whatsoever that the sock belonged to or was connected with the alleged victim in any way." We agree with the State, however, that Cannon is distinguishable from the case at bar. Cannon was a rape case in which our supreme court concluded that the introduction of a pair of pantyhose containing the defendant's DNA was reversible error because the State failed to show a sufficient chain of custody to establish that the item belonged to the victim. Id. at 309. In the case at bar, the defendant raised no objection to the sock's chain of custody but instead merely argued that it should not be admitted unless the State could prove that it belonged to the victim. In overruling the objection, the trial court noted that the State's inability to identify the sock as the victim's went to the weight, rather than admissibility, of the evidence. We find no error in this ruling. The fact that the victim's body was found without socks and that a small, partially-burned sock was discovered on the defendant's property soon after her disappearance was yet more circumstantial evidence of the defendant's premeditation. Furthermore, the probative value of such evidence was not outweighed by its prejudicial effect. We conclude, therefore, that the trial court did not err in admitting the evidence.

## VI. Alleged Improper Opinion Testimony

The defendant next contends that the trial court erroneously permitted Detective Corcoran to offer improper opinion testimony. Specifically, he argues that the trial court erred in ruling that defense counsel "opened the door" to the prosecutor's questions on redirect as to "whether the detective presented evidence that [the defendant] had killed the victim with premeditation and that he had kidnapped her in Davidson County and that she was killed or ended up in Smith County." The State argues that the trial court did not abuse its discretion by allowing the prosecutor to ask Detective Corcoran essentially the same questions defense counsel had asked on cross-examination in order to clarify and rehabilitate the detective's cross-examination testimony.

On cross-examination, Detective Corcoran conceded that he had given sworn testimony to the Davidson County Grand Jury that the defendant had committed in Davidson County the same crimes, including first degree premeditated murder, felony murder during the perpetration of a kidnapping, and especially aggravated kidnapping, for which he was currently on trial in Smith County. Upon further cross-examination, the following exchange took place:

> Q.    You don't know the cause of death in this case, do you?
>
> A.    No, sir.
>
> Q.    You don't know if she was killed and you don't know where she was killed, do you?
>
> A.    That's correct.
>
> Q.    You don't know whether she was kidnapped or not, do you?
>
> A.    That is correct.
>
> Q.    You don't know that she was killed in the perpetration of any theft, do you?
>
> A.    No, sir.
>
> Q.    And I ask you this -- if I did, I don't mean to be repetitious, you don't know where she was killed, if she was killed; you don't know that, do you?

A.    No, sir.  The investigation shows that she was in Nashville and ended up in Smith County.  Where she was killed along the way, I don't know, but all of the information that we've obtained shows that the car was taken, that she was the last person that had the car and the car ended up in Macon County at some point and back in Wilson County.

Q.    You don't know whether she voluntarily drove it here or what; you don't know that, do you?

A.    No, sir.

In response to a series of questions asked by the prosecutor on redirect examination, Detective Corcoran testified that, based on his investigation, he had presented evidence to the Davidson County Grand Jury that the victim was "murdered and kidnapped," "that her car was stolen," "that she was murdered during the theft of her car," and that "she was premeditatedly murdered" while one of the TBI agents later presented evidence of the same in Smith County.  He also said that, based on his investigation, the kidnapping began in Davidson County.  The prosecutor then asked him where the kidnapping ended based on his investigation.  At that point, defense counsel objected, arguing that the question called for a legal conclusion.  The trial court overruled the objection, stating:

Sir, I agree that is a conclusion that this jury will have to draw, but it is in response to your question asking for a same or similar conclusion.  Ladies and Gentlemen of the jury, this is not an expert witness, all right?  He's a fact witness, but I'm going to allow that question because you asked a similar question, and I think you opened the door there, [Defense Counsel].

The prosecutor then asked what proof Detective Corcoran had that the victim "was kidnapped in Davidson County at the beginning," and the detective replied:

The fact that -- all of the witnesses I interviewed.  All the information received places her in that area, the vehicle last seen in that area, [the defendant's] Jeep recovered from that area, and then finding her body in Smith County, but that's where it all began, right there in that intersection of Old Hickory Boulevard and Nolensville Road.

The trial court sustained defense's counsel objection to the question, "And where did the crimes ultimately end?" and the following exchange then took place between the prosecutor and the witness:

Q.     At some point during the investigation and in the indictment process, did we decide to try this case in Smith County rather than Davidson County?

A.     Yes, ma'am.

Q.     Why?

A.     For the venue, for the fact of where the body was found.

Although some of the prosecutor's questions were inartfully phrased, we cannot conclude that the trial court erred in overruling the defendant's objection and allowing the testimony. When viewed in the context of the entire cross and redirect examination, it is clear that the prosecutor was not attempting to elicit an opinion or legal conclusion from the detective, but was instead trying to show the progression of the detective's investigation and the reason the defendant was first indicted in Davidson County and then again for the same crimes in Smith County. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## VII. Evidence of the Defendant's Movement of Firearms

The defendant next contends that the trial court erred by allowing Agent Wilkerson to testify about his movement of his firearms to his mother's house, arguing that the evidence was irrelevant and unfairly prejudicial to his defense because it forced him to waive his right against self-incrimination. The State disagrees that Agent Wilkerson's testimony forced the defendant to waive his Fifth Amendment rights and argues that any error in the admission of the evidence was clearly harmless.

The record reveals that the State responded to the defendant's initial objection to the testimony on the grounds of relevance by stating that it had to give "the jury options on how [the victim] was kidnapped and how she was killed." The trial court overruled the defendant's objection, and Agent Wilkerson testified that the defendant told him that he had moved his guns to his mother's residence because he knew the officers were coming to interview him and he did not want them to find the weapons at his house. In a subsequent jury-out hearing, defense counsel and Agent Wilkerson revealed that the defendant's complete statement to the officer was that he had moved the weapons because he had a felony conviction and did not want them to be found at his house. Defense counsel then asked that the trial court strike the testimony, arguing that it had been elicited in a manner that left the jury with the "totally fraudulent impression" that the defendant had moved the guns for some sinister purpose, which would force the defendant to waive his self-

-29-

incrimination rights in order to explain "this discrepancy in this matter."

The trial court denied the defendant's motion to strike, and the State then offered to ask Agent Wilkerson the additional question of whether he knew if the guns were involved in the victim's disappearance. Defense counsel stated that he had no objection, and the State thereafter elicited Agent Wilkerson's testimony that there was no evidence that the defendant's guns were involved in the crimes.

The rules of evidence provide that irrelevant evidence is not admissible and that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Tenn. R. Evid. 402, 403.

We agree with the defendant that his statement about moving firearms to his mother's house should not have been admitted at his trial, as it was irrelevant and potentially prejudicial to his case. However, we also agree with the State that the error was harmless. As the State points out, Agent Wilkerson's testimony that there was no evidence that the weapons were involved in the victim's disappearance should have allayed suspicions on the part of the jury that the defendant had moved the weapons for some "sinister" reason. Moreover, the defendant's claim that the evidence forced him to waive his rights against self-incrimination is belied by the fact that he mentioned nothing about the weapons during his testimony. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## VIII. Closing Argument

Lastly, the defendant contends that the trial court erred by denying his request for both defense counsel to deliver separate portions of the closing argument "sandwiched between the [S]tate's two arguments." He argues that the trial court could have granted the request under the Tennessee Rules of Criminal Procedure, which provide that the court has the discretion to set "the number of closing arguments in excess of one permitted each defendant," Tenn. R. Crim. P. 29.1(d)(1)(B), and that its decision to follow its usual practice of allowing argument by only one defense counsel, without consideration of such factors as the length of the trial, the number of witnesses, the complexity of the issues, and the gravity of the charges, was arbitrary and an abuse of discretion.

The trial court is given substantial discretion in controlling the course of closing arguments and its decisions will not be reversed on appeal absent a showing of an abuse of discretion. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)); see also State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App.

1995).

As an initial matter, we agree with the State that the defendant waived consideration of this issue on appeal by acquiescing when the trial court explained its practice of allowing closing argument from only one counsel. The record reflects that just before the start of closing argument, senior defense counsel informed the court that he had just learned that the State was going to use two different prosecutors to deliver its closing argument and wondered if the court would allow both defense counsel to "to argue in between that?" When the trial court replied that it normally allowed just one, defense counsel responded, "Well, normally the attorney general closes the argument in this matter." The trial court observed that they had "a selection of three," to which defense counsel retorted, "You ain't got but one from this county." At that point, one of the Nashville district attorneys stated that she and her colleague were acting as pro tem district attorneys in Smith County. The following exchange then took place:

> THE COURT: They're pro tem. That's why they're here. I think I'm going to stick with the rule I usually go with. I don't think it's right at this late time to change.
>
> [SENIOR DEFENSE COUNSEL]: We're not changing anything. I didn't know it was set up -- I didn't know how it was set up, but it's all right.
>
> THE COURT: Well, I'll just take you at your word. Okay, Anything else?
>
> [ASSISTANT DISTRICT ATTORNEY]: No, sir.
>
> [SENIOR DEFENSE COUNSEL]: All right, okay.

Even if not waived, the defendant has not shown that the trial court abused its discretion in denying his last-minute request to change the court's established practice of allowing argument by only one defense counsel. We conclude, therefore, that the defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-31-