IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

March 7, 2017 Session

**STATE OF TENNESSEE v. COURTNEY FIFER**

**Appeal from the Criminal Court for Shelby County**
No. 14-01725　　　John Wheeler Campbell, Judge

_____

**No. W2016-00713-CCA-R3-CD**

_____

Following a jury trial, Defendant, Courtney Fifer, was convicted of first degree murder, attempted robbery, and being a felon in possession of a handgun. He was sentenced to life for first degree murder, two years for attempted robbery, and one year for being a felon in possession of a handgun. On appeal, Defendant argues that his right to a fair trial was violated because the trial court improperly restricted his closing argument, and the prosecutor misstated evidence during closing argument. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Courtney Fifer.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kirby May, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

**State's Proof**

Zelda Leverson testified that the victim, Ramon Chism, was her youngest child, and he lived with her on French Market Circle. Ms. Leverson testified that she last saw the victim alive between 9:45 and 10:00 p.m. on September 16, 2013, when he left her residence to take Anwan Bonds, a childhood friend, home. Ms. Leverson received a

phone call approximately fifteen minutes later from the victim's girlfriend. As a result of that call, Ms. Leverson went to the Regional Medical Center where she identified her son, who later died as the result of a gunshot wound.

Officer Deangelo Davis of the Memphis Police Department testified that at approximately 10:17 p.m. on September 16, 2013, he was dispatched to a gas station located at 4260 Winchester Road regarding a shooting. He arrived on the scene and discovered the victim inside of a minivan. Marque Burchette and Anwan Bonds were also in the van. Officer Davis called for an ambulance and took information from Mr. Burchette and Mr. Bonds. Officer Davis learned that the shooting had occurred in the area of Ashwood Street and the Camelot Manor Apartments. He also received information from Mr. Bonds concerning the shooter: "It was 5'5, around 150 pounds, looked to be 22 years of age. Wearing a red shirt, red hat, armed with a handgun." Mr. Bonds also indicated that he had "seen the suspect before and could identify him if he was seen again." Officer Davis relayed the information to the investigators. The victim was transported to the Regional Medical Center in critical condition. Mr. Burchette and Mr. Bonds were placed in separate patrol cars and taken to the police station for questioning.

Anwan Bonds testified that he and the victim spent a portion of the day on September 16, 2013, at Ms. Leverson's house. He and the victim left at approximately 8:45 p.m. to go to Kroger, and they returned to Ms. Leverson's house at approximately 9:15 p.m. Mr. Bonds testified that he and the victim were sitting in the victim's minivan in front of Ms. Leverson's house when the victim received a phone call. Mr. Bonds testified that he and the victim had planned to get some chicken before the call, and the victim was going to drive Mr. Bonds home. Instead, the victim drove him to an area near the Camelot Manor Apartments on Ashville Street.

Mr. Bonds testified that Mr. Burchette walked to the van from a nearby house. He said that he knew Mr. Burchette because Mr. Burchette stayed with someone in the same apartment complex where the mother of one of the victim's children lived. Mr. Bonds testified that Mr. Burchette told the victim, "We can't do this right here," and the victim told him to get into the van. Mr. Bonds explained that Mr. Burchette indicated that he wanted to buy a "forty" of powder cocaine from the victim, but Mr. Burchette was twenty dollars short. Mr. Burchette said that his brother was going to bring the additional money. At that point Mr. Burchette told the victim to "back back." Mr. Bonds testified: "And if he would have backed back, he would have been blocked in, so [the victim] just pulled off. And once he pulled off, he got in front of the apartments and made a U-turn and came back." Mr. Bonds testified that the victim parked the van near Ashwood and Ashview Streets to wait for Mr. Burchette's brother to bring the money.

Mr. Bonds could see other people standing around the nearby houses, and one man, later identified as Defendant, walked up to the passenger side of the van where Mr.

Bonds was sitting. Mr. Bonds noted that it was approximately 10:00 p.m., and there was a street light behind the van so he was able to see outside. The victim asked Mr. Burchette if Defendant was his brother, and Mr. Burchette did not respond. At that point, the victim lowered the passenger side window, and Defendant said, "I want the shit if it's good." The victim responded, "What are you talking about?" and Defendant answered, "You know what I'm talking about. If the shit's good, I want it." Mr. Bonds noted that Defendant was wearing a red shirt and hat, and he had a mole or tattoo on the right side of his face. He also said that Defendant's eyebrows were distinctive. Mr. Bonds testified that the victim again asked Mr. Burchette if Defendant was his brother, and Mr. Burchette said, "I don't know that ni - - - r." Mr. Bonds testified that at some point Defendant said, "You know what time this is," which meant that it was a robbery. Mr. Bonds told the victim to "pull off." He said that the victim "reached for the gear and [Defendant] stuck the gun in [the van] and shot [the victim]." Mr. Bonds testified that the victim did not immediately realize that he had been shot, and he drove away from the scene. The victim discovered that he had been shot and attempted to drive toward an ambulance that they had passed. He also told Mr. Bonds to call his (the victim's) fiance´. The victim then became dizzy and passed out before he got to the ambulance. Mr. Bonds was able to take control of the van and drive it to a gas station. Mr. Bonds rendered aid to the victim while a bystander called 9-1-1. He spoke to the 9-1-1 operator and continued rendering aid to the victim until police and an ambulance arrived. Mr. Bonds and Mr. Burchette were immediately placed in separate patrol cars and later transported to the police station for questioning. Mr. Bonds testified that he spoke with investigators, and he was shown a photographic lineup on September 18, 2013. He identified Defendant as the shooter.

Dr. Erica Curry, a medical examiner with the West Tennessee Regional Forensics Center, performed an autopsy on the victim on September 17, 2013. She said that the victim died as a result of multiple gunshot wounds. Dr. Curry testified that the most significant wound was the gunshot to right side of the victim's abdomen. The victim also had a gunshot wound to his right arm. The victim's blood tests indicated that he had recently used cocaine.

Marque Burchette testified that he knew the victim "[t]hrough the neighbors upstairs" at the 6111 Apartments. Mr. Burchette testified that he had known the victim for approximately four months at the time of the shooting, and they were friends. In September 2013, Mr. Burchette was dating Jerricka Fifer who lived in a house on Ashwood Street. He said that Ms. Fifer is the cousin of Derrick Fifer who was known to Mr. Burchette as "White Boy." Mr. Burchette testified that he had known Mr. Fifer since the eighth grade, and he thought Mr. Fifer to be his distant cousin. He and Mr. Fifer were "hanging out" and smoking marijuana with some other men at Ms. Fifer's house prior to the shooting. Mr. Burchette testified that he had called the victim several times to ask for a ride home so that Mr. Burchette could get ready for work. He and Mr. Fifer also planned to buy 40 dollars worth of cocaine from the victim.

- 3 -

Mr. Burchette testified that the victim and Mr. Bonds arrived at the house in the victim's van "a little bit after ten o'clock," and Mr. Burchette got into the back seat. He said that Mr. Fifer was "nowhere around." Mr. Burchette called Mr. Fifer and asked if he still planned to purchase the cocaine. He said that Mr. Fifer indicated that he was leaving the Camelot Manor Apartments. The victim turned the van around and drove to the apartments. Mr. Fifer never came out so the victim pulled back in front of Ms. Fifer's house. Mr. Burchette testified that he called Mr. Fifer a second time and "asked him where you at." Mr. Fifer said that he was on his way; however, Defendant, whom Mr. Burchette did not know, showed up at the passenger side of the van. He noted that Defendant had two teardrop tattoos under his right eye. Mr. Burchette said, "[Defendant] walked up talking the same thing [Mr. Fifer] was saying." He testified that Defendant said, "I want a forty," which referred to cocaine.

Mr. Burchette testified that he told the victim that he did not know Defendant, and the victim attempted to drive away but Defendant "was holding his hand in the window and he shot [the victim]." He said that Defendant fired two shots. Mr. Burchette testified that the victim lost a lot of blood and "went out of it." They were able to stop the van at a gas station on Winchester Road. Mr. Burchette testified that he was later taken to the police station, and he told investigators what happened. He admitted that he did not give them all of the details when he first talked to them because he was "shooken up" and afraid. Mr. Burchette spoke with police again the following day, and they discussed the shooting in more detail. He told them everything that he could remember about the shooting. Mr. Burchette told police during the second interview that the shooter's name was "Boogie." Mr. Burchette thought that Mr. Fifer set up the robbery attempt and that "Boogie (Defendant)" and Mr. Fifer had been together the previous Friday. Mr. Burchette overheard them say that they "needed a couple of racks [$2,000]" and that they were going to "get them by any means necessary." The conversation took place in Mr. Fifer's grandmother's yard. Mr. Burchette described the shooter as wearing a "green short sleeved T-shirt with a white hat[.]" Mr. Burchette testified that he was shown a photographic lineup, and he identified Defendant as the shooter. He told police that he was one-hundred percent certain of the identification.

Crime Scene Investigator Demario Wells testified that he processed the scene of the shooting. He collected a "spent nine millimeter Lugar Winchester casing" from the front seat of the victim's van. Officer Wells also recovered a small plastic bag from inside the van that contained a white powdery substance that tested positive for cocaine. Officer Wells drove to the Regional Medical Center and collected a bullet fragment that had been recovered from the victim's body.

Sergeant Roosevelt Twilley of the Memphis Police Department, Internet Crimes Against Children Division, performed a forensic examination of Mr. Burchette's cell phone. The "summary report" for Mr. Burchette's phone established that Mr. Burchette

had contacted Derrick Fifer and the victim numerous times prior to the shooting. In particular, Sergeant Twilley testified that the report showed:

> 8:42:47 p.m., Mr. Burchette called Derrick Fifer for twenty-four seconds. 8:57:43 p.m., Mr. Fifer called Mr. Burchette for ten seconds. 9:03:31 p.m. called Mr. Burchette for eight seconds. 9:11:14 p.m., Mr. Burchette called [the victim] for forty-seven seconds. 9:51:12 p.m., Mr. Burchette called [the victim] for thirty seconds. 10:07:54 p.m., Mr. Burchette called [the victim] for one minute and four seconds. 10:10:46 p.m., Mr. Fifer called Mr. Burchette for twenty-two seconds. 10:12:27 p.m., Mr. Burchette called [the victim] for eighteen seconds. And at 10:12:27 p.m., Mr. Burchette called Derrick Fifer for thirty-four seconds.

Officer Timothy Rogers of the Memphis Police Department testified that he responded to a home burglary call at 3703 Oakleigh Avenue on March 10, 2013. He said that several firearms were stolen from the residence including a "Smith and Wesson model MMP 9," with a serial number of "HAM7745."

Officer James Walton of the Memphis Police Department testified that he was involved with a traffic stop on April 19, 2014, in the area of "702 North Forrester." He said that Justin Reid, Fredericka Hines, and Deandre Bonner were in the car along with several firearms. One of the firearms recovered from the car was the Smith and Wesson stolen from the residence on Oakleigh Avenue.

Special Agent Eric Warren of the Tennessee Bureau of Investigation (TBI), Firearms Identification Unit, testified that he examined the shell casing and bullet fragment recovered in the present case. He agreed that "firearms don't typically stay with one person. They can go through a community and through individuals or through a group[.]" Special Agent Warren testified that the shell casing recovered in this case had been fired from the recovered Smith and Wesson nine millimeter weapon. He said that the bullet fragment was too damaged to make a precise determination regarding the specific gun from which it had been fired, but it showed marks consistent with having been fired from the same type of gun.

Israel Taylor of the Memphis Police Department testified that in September 2013 he was working as a sergeant in the homicide division and was the case coordinator for the victim's homicide investigation. As part of the investigation, he was given the address of 3201 Ashwood Street where the Fifer family resided which included: Defendant, Derrick Fifer, Tammy Fifer, and Jerricka Fifer. Sergeant Taylor testified that as a result of his investigation, he developed Defendant as a suspect in the victim's murder. He also learned that Defendant's nickname was "Boogie." Sergeant Taylor noted that Defendant had two teardrop tattoos on his right cheek that was consistent with

- 5 -

descriptions of the shooting suspect given by Anwan Bonds and Marque Burchette. He also noted that Derrick Fifer went by the nickname of "White Boy."

Sergeant Taylor testified that Defendant became a suspect after Sergeant Taylor re-interviewed Mr. Burchette on September 18, 2013. He said, "[T]hat's when we learned the nickname Boogie." Mr. Burchette was shown a photographic line-up, and he identified Defendant as the shooter. Sergeant Taylor testified that Mr. Bonds also identified Defendant from a photographic line-up. Thereafter, members of the "gang unit" were sent out to locate Defendant. They found Derrick Fifer at the address on Ashwood and asked him to come to the police station. Mr. Fifer gave consent to have his cell phone searched, and Sergeant Taylor later obtained a search warrant for the phone records as well. Sergeant Taylor found it unusual that all of the text messages on Mr. Fifer's phone were erased. He obtained a summary of the phone calls between Derrick Fifer and Mr. Burchette which were made on September 16, 2013. Sergeant Taylor testified that Derrick Fifer indicated that Defendant could possibly be found in Columbus, Mississippi. Sergeant Taylor followed up on the information and eventually sought a warrant for Defendant's arrest. Defendant turned himself in on September 23, 2013, and Sergeant Taylor spoke with him. He said that Defendant did not have a cell phone, which Sergeant Taylor thought was unusual.

### Defense Proof

Tammy Fifer, Defendant's and Derrick Fifer's mother, testified that on July 12, 2013, Defendant moved to Columbus, Mississippi, and he was still living there on September 16, 2013. Ms. Fifer testified that Defendant's father drove him back to Tennessee on September 23, 2013. She said that Defendant had never had a cell phone or a car. Ms. Fifer also testified that he did not have a nickname of "Boogie."

On cross-examination, Ms. Fifer clarified that she also moved to Columbus, Mississippi on July 12, 2013. She said that prior to that time she had been living in a hotel, and Defendant had been living with Ms. Fifer's mother, Vernice Alexander, at 3201 Ashwood Street. Derrick Fifer also stayed at the residence sometimes, and his nickname was "White Boy." Jerricka Fifer, Ms. Fifer's niece, lived next door to Ms. Alexander. Ms. Tammy Fifer did not recall speaking to police on September 25, 2013, and telling them that she had not seen Defendant since July 1, 2013.

Rita Hood testified that Defendant is her "sister's stepson." She said that Defendant was living at her sister's house in Columbus, Mississippi on July 12, 2013. Ms. Hood testified that she usually visited her sister's house two times a month on the weekends, and Defendant was there, including times that she visited in September 2013. She did not recall the dates that she saw Defendant at her sister's house.

On cross-examination, Ms. Hood testified that her sister's husband, Calvin Gardner, drove from Mississippi to Memphis every week. She said that he would spend weekends with her sister in Mississippi. Ms. Hood did not have any personal knowledge whether Defendant was at her sister's house on September 16-17, 2013.

Calvin Gardner, Defendant's father, testified that on July 12, 2013, he picked Defendant up in Memphis and drove him to Columbus, Mississippi. He said that Defendant did not return to Memphis until Mr. Gardner drove him there because police were looking for him "about this charge here." Mr. Gardner testified that Defendant did not have a cell phone or a car, and he did not go by the nickname "Boogie." Mr. Gardner said that he works in Memphis during the week, and returns to Mississippi on the weekend. He testified that Defendant was in Mississippi the weekend before September 16, 2013.

On cross-examination, Mr. Gardner testified that Defendant had had the two tear drop tattoos on his cheek for a couple of years, and they were noticeable. He said that Defendant was living on Ashwood Street with his grandmother prior to moving to Mississippi. He did not know who else lived in the house.

Alice Thompson testified that she knew Defendant through his father and stepmother. She said that she saw Defendant at their house on Saturday, September 14, 2013. Ms. Thompson testified that Defendant was always there during other times that she visited the house.

Burnett Crowell testified that Defendant is her son's best friend. She said that she was living in Columbus, Mississippi on September 16, 2013, and she saw Defendant at her mailbox early that morning. Ms. Crowell testified that she also saw Defendant on September 17, 2013, walking in the neighborhood with her son. Ms. Crowell noted that her son was not mentally stable, and he and Defendant were constantly "walking in that hot sun." She also testified that she was once married the Defendant's father, Calvin Gardner.

Derrick Fifer testified that Defendant is his younger brother. He said that Defendant never had a nickname of "Boogie," and Defendant was living in Columbus, Mississippi in July of 2013. Mr. Fifer testified that he was at 3203 Ashwood Street on September 16, 2013, and Defendant was not there. He said that he last saw Defendant in July 2013. He also said that Defendant did not have a cell phone or a car. Mr. Fifer testified that he spoke with police about the victim's murder, and he gave them permission to search his cell phone.

On cross-examination, Mr. Fifer testified that Marque Burchette is his cousin. He said that he did not know Jerricka Fifer but he knew Jaleesa Fifer who was also his cousin. Mr. Fifer testified that Mr. Burchette arrived at the residence on Ashwood Street

at approximately 4:00 p.m. on September 16, 2013. Several other individuals were also at the residence, including "Ted the Shooter." Mr. Fifer testified that he and Mr. Burchette planned to buy drugs from the victim. They were not friends and did not "hang out" together. Mr. Fifer acknowledged that he had a teardrop tattoo on his left eye. Mr. Fifer testified that Mr. Burchette "ordered the drugs" from the victim, and they went in "half and half" to pay for them.

Mr. Fifer testified that although he could not say for certain, he thought the victim arrived at the residence at approximately "seven or eight[.]" Mr. Fifer testified that he, "Hoover, Ted, Rod, and [Mr. Burchette] had been standing outside when the victim first arrived. Mr. Fifer said that he gave Mr. Burchette twenty dollars for the drugs, and he went back inside the house to use the restroom. He said that Mr. Burchette later called and asked him for ten more dollars but Mr. Fifer told Mr. Burchette that he did not have any more money. Mr. Fifer testified that he heard a gunshot and walked back outside. He said that the victim's van was gone, and he called Mr. Burchette who told him that the victim had been shot. Mr. Fifer testified that he saw "Rod" and "Ted" run away from the scene after the shooting and get into a white vehicle. He described "Ted" as being five feet eight or nine inches, having dreadlocks on the top of his head, and he had tattoos on his face. Mr. Fifer acknowledged that the information he provided to police shortly after the shooting was different. He said that he had "tried to find out more" about "Ted" because Mr. Fifer was "really trying to get him." He told police that "Ted" did not have any tattoos on his face; however, he later learned that "Ted" had tattoos on his face. Mr. Fifer could not explain why he did not notice the tattoos when he was hanging out with "Ted" in person.

Tykika Perry, Defendant's stepsister, testified that Defendant was at home with her and her mother all day on September 16, 2013, in Columbus, Mississippi. She said that Defendant did not have a car or a cell phone. Ms. Perry testified that she woke Defendant up at approximately 6:15 to 6:20 p.m. to ride with her to play Bingo, and they also picked up Kelvin Harris. Ms. Perry testified that she drove her mother's car, and Defendant rode in the passenger seat. They arrived at the Bingo hall at approximately 7:00 p.m., and Ms. Perry and Mr. Harris went inside. Defendant left in the car. Ms. Perry did not know where Defendant went after he left, but she testified that he was at home when she got back between 9:30 and 10:00 p.m.

Deborah Hood, Defendant's step-mother, testified that Defendant was living with her in Columbus, Mississippi on September 16, 2013. He did not have a car or a cell phone. Ms. Hood testified that she had taken off from work on September 16, 2013, because her anniversary was the following day. Ms. Hood testified that Defendant asked her about some money, and she "told him, no, I'll give it to him tomorrow, and so he left." She thought that Defendant wanted the money to buy some gummy bears. Ms. Hood testified that Defendant visited his friend that day and came home to take a nap. He later left to take Ms. Hood's daughter to Bingo. She said that she told Defendant not

to be gone long in her car and to bring it straight back home. Ms. Hood testified that Defendant again asked her for two dollars, and she told him that she would give it to him the next day. She said that Defendant came back home and was asleep by 9:00 p.m.

On cross-examination, Ms. Hood acknowledged that Defendant had two teardrop tattoos around his eye. She thought that he had gotten them seven years earlier when he had gotten into trouble. Defendant did not have a job at the time. Ms. Hood testified that she did not know Derrick Fifer very well.

Kelvin Harris testified that he knew Defendant through Mr. Harris' best friend, Tykika Perry. He said that Defendant accompanied Ms. Perry to pick him up on September 16, 2013, to play Bingo. Mr. Harris testified that he and Ms. Perry went inside to play Bingo, and Defendant left.

### State's Rebuttal Proof

Sergeant Israel Taylor was recalled as a witness. He testified that Derrick Fifer gave him the names of "Ted," "Rod," and "Hoover" along with some physical descriptions. He did not give any further information about those individuals. Sergeant Taylor testified that the physical descriptions of the men were not consistent with the descriptions given by the victims, Mr. Burchette and Mr. Bonds, who were present during the shooting.

*Analysis*

Defendant argues that his right to a fair trial was violated because the trial court improperly restricted his closing argument, and the prosecutor misstated evidence during closing argument. We disagree.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Both the State and the defense are afforded wide latitude in arguing their cases to the jury. *State v. Cleveland,* 959 S.W.2d 548, 551 (Tenn.1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn.1994)). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Tennessee Rule of Criminal Procedure 29.1(b)(2) allows a closing argument to address any evidence introduced at trial. In addition to addressing the evidence, parties may also argue "reasonable inferences." *State v. Chico McCracken*, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. app. denied* (Tenn. Sept. 2, 2003). A party's argument "must be temperate, predicated on evidence introduced during trial, relevant to the issues

being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 568 (Tenn. 1999). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *State v. Trusty*, 326 S.W.3d 582, 607 (Tenn. Crim. App. 2010).

First, Defendant argues that the trial court improperly restricted his closing argument and "abused its discretion when it refused to allow defense counsel to state what he believed the proof showed." During closing argument, defense counsel made the following statement:

> This is something if you were inches away, these are details that you would know. When you're judging the identification and the reliability of it, you have to look at all of those factors.

> If it was how in the world can we reach these contradicting statements - -

> Now, keep in mind, the first thing that he said and it's almost, I don't know how serious we're taking this oath, it seems like, when you swear to tell the truth.

> He took an oath and my concern with Mr. Bonds is this, this is the biggest concern I have. When he gave his statements, and when he talked on the stand, I could not tell the difference - -

At that point, the State requested a bench conference, and the following exchange took place:

> [Prosecutor]: Is he telling the truth, that's for the jury to decide, not for him to decide his credibility. And two, all I'm hearing is I, I, I. It is for the jury to decide.

> THE COURT: You can't talk about the way [sic] you think the proof shows, you just can't do that.

> [Defense Counsel]: Okay.

The trial court's ruling, addressed directly to Defendant's counsel, can clearly be interpreted as an erroneous statement of the law. One of the basic types of permissible closing arguments is what witnesses have said under oath. Included in this is an attorney's right to argue that some testimony contradicts other testimony or what is displayed in exhibits. Accordingly, an attorney is absolutely allowed to show what evidence was presented, and "the way" there are contradictions.

- 10 -

However, the State's objection, even though preemptive, appears to object to defense counsel's going down a path to vouch for the credibility of a witness, i.e., to say in effect, "I believe this witness lied in her testimony." "A lawyer should not assert his personal opinion as to the credibility of a witness, or as to the guilt or innocence of an accused. He may argue, on his analysis of the evidence." *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989).

Before the ruling which is the subject of this issue, the trial court had already warned defense counsel that he could not give his opinion as to what was the credible evidence. During Defendant's closing argument, the following took place:

> Well, if they don't have someone else and whether that was someone else, I don't know. I just know that [Defendant] wasn't there.
>
> But if they don't have someone else - -
>
> THE COURT: Whoa, let me say this again. You can't use your opinion. Okay? You've got to refer to the proof, not your opinion.
>
> Ladies and gentlemen, lawyers['] opinions mean nothing. I want to make sure this is really clear. The lawyers can't tell you what they think, how they think the case should be or anything else. That's your decision.
>
> And so, the lawyers can only argue with what they think the proof shows and they can argue the proof. Okay? All right, you may continue.

From the entire closing argument it is clear that the trial court did not improperly "refuse[]to allow defense counsel to state what he believed the proof showed." Defendant is not entitled to relief on this issue.

Next, Defendant argues that "the defense was barred from being able to discuss and argue to the jury any of the evidence supporting the fact that Marque Burchette's identification was coerced, or interfered with." He further states that this issue is "particularly important in this case, when Mr. Burchette, while under oath and in open court, stated that he did not see the shooter he described as 'Boogie,' in the court room, of the defendant's trial."

During trial, the following took place during Mr. Burchette's direct examination:

> Q. What did you tell them when you talked to them the second time?
>
> A. Everything I remembered. At first I was shooken [sic] up. The first day I was shooken [sic] up like too much stuff was happening and my mind wasn't pumping right or whatever.

Q. So you didn't tell them everything did you, when you got there at the police station?

A. I was scared.

Q. You didn't the first time?

A. No, sir.

Q. So did you tell them who the shooter was when you talked to them that second time?

A. Yes, sir.

Q. Who was the shooter?

A. Boogie.

Q. Boogie. All right. Do you see Bookie [sic] here in the courtroom today? Do you see him? You don't see Bookie [sic] in the courtroom today?

A. No.

Q. So what else did you tell the police about the shooting and the robbery attempt?

A. About the shooting?

Q. Who did you tell the police you thought set it up?

A. White Boy [Derrick Fifer].

Q. White Boy? What did you tell the police about the previous Friday and Bookie [sic] and seeing Bookie [sic] and White Boy together?

A. What you say again, can you repeat that?

Q. Did you tell the police - - Mr. Burchette, you gave a statement, have you had a chance to look at your statement?

A. Yes, sir.

Q. Okay. Now is that statement accurate? Your second statement where you describe what had happened?

A. Yes, sir.

Q,    And that is truthful?

A.    Yes, sir.

Q.    Okay. So when you told the police - - the police ask you who is Bookie [sic]?  And was your response, I seen him with White Boy the previous Friday, is that correct?

A.    Yes, sir.

*        *        *

Q.    Speak up.  Is that a yes?

A.    Yes, sir.

Q.    And you said - - you were asked a question about the previous Friday night and the discussion you overheard between Bookie [sic] and White Boy, do you remember that?  Do you remember telling the police about the conversation you heard between Bookie [sic] and White Boy?

A.    Yes, sir.

Q.    Do you remember saying to the police, they was talking about they needed a couple of racks, they was going to get them by any means necessary.  And I went to the house because I didn't want to be a part of what he was talking about.  Is that correct?

A.    Yes, sir.

Q.    Is that correct?

A.    Yes, sir.

Q.    And the question was asked, where did this conversation take place, is that correct?

A.    Yes, sir.

Q.    And your response is, in White Boy's grandma's yard in Ashwood?

A.    Yes, sir.

Q.    And you were asked, what is a couple racks?  And what is a couple racks?

A. A thousand, like two thousand dollars.

Q. A lot of money. And the question was asked, what does it mean - - well, what does it mean to take by any means necessary, what do you mean by that?

A. Break in. Steal. Rob.

Q. And so why do you think White Boy set you up? You were asked that specific question, weren't you?

A. Because he was trying to - - he supposed to been coming. He didn't come. He said he was on the way. Somebody else came.

Q. Boogie showed up? Boogie walked up, is that correct?

A. Talking the same thing White Boy was saying.

Mr. Burchette testified that the man who shot the victim had "two tear drops" (tattoos) under his right eye. He said that police showed him a photographic line-up on September 17, 2013, and he identified Defendant as the shooter. Mr. Burchette told police that he was one-hundred percent confident of his identification. During cross-examination, the following exchange took place between Mr. Burchette and defense counsel:

Q. It was two packs, so for a total of forty dollars, the two packs. So when you came back down to the police the second time, they pulled you in a room and they said things along the lines of we know you know more, we have a person, we need you to identify him. Things of that nature, correct?

A. They weren't that blunt about it they - -

Q. Is that the - -

\*      \*      \*

THE COURT:    Let him answer the question and then you can follow-up. Go ahead.

A. They wasn't as blunt about it but yeah.

During closing argument, defendant counsel made the following statement:

Well, then what else did he say? He said when he came down and testified - - and I asked him point blank. I asked him point blank, even if I get reprimanded it

- 14 -

appears sometimes and I'm just trying to get to the evidence, I asked him, well, isn't it true that the police actually told you they had the shooter and they wanted you to just pick him? And what did he say? And no one challenged it. What did he say? He said, well, they didn't actually use that direct of a language, but they made it clear. That's what they were going to do.

> Because what happened? He said that the shooter had a nickname of Boogie.
>
> And what did the police officer say? And this is to tell you how the police officer said, well, we developed the nickname of Boogie. That's not developing the nickname. Somebody said to you that was the nickname and you ran with it. You didn't double check it, cross reference it, anything.
>
> And what happened when all the testimony that again went unrefuted? [Defendant] never had the nickname of Boogie.
>
> But then what else happened? They said the police got him down there, they made him pick this person, and the reason they were able to come up with [Defendant] even at all is they see, well, Derrick Fifer, there's somebody related to Derrick Fifer and they have a tattoo on their face. Wala, they come up with [Defendant].
>
> So then what did they do? They make Marque circle this person and say this is the shooter - -

At that point, the State objected to defense counsel's argument noting that "[t]here was absolutely no evidence that Marque Burchette, the officers made Marque Burchette identify somebody." The trial court agreed and noted that Mr. Burchette did not testify that he was coerced to do anything, and he did not "say they made him pick anybody out[.]" The trial court further stated that defendant counsel was "overstating the evidence."

The trial court in this case did not abuse its discretion in finding that defense counsel had overstated the evidence by arguing that police forced Mr. Burchette to circle Defendant's picture in the photographic line-up and identify him as the shooter. That was not Mr. Burchette's testimony at trial. He was merely asked by defense counsel if police pulled him in a room and "said things along the lines of we know you know more, we have a person, we need you to identify him." Mr. Burchette replied: "They wasn't as blunt about it but yeah." Mr. Burchette never said that he was coerced into identifying Defendant.

Defendant also argues that this issue is important because Mr. Burchette testified during trial that he did not see the shooter in the courtroom. Despite confusion in the transcript about the shooter's nickname (Boogie or Bookie), Defendant testified that he identified Defendant's picture from the photographic line-up as the person he saw shoot the victim, and he told police that he was one-hundred percent certain of his identification. Anwan Bonds also identified Defendant as the shooter from a photographic line-up, and he also identified Defendant in the courtroom as the person who shot the victim. Mr. Bonds noted that he was within a foot of Defendant when he shot the victim, and he knew Defendant's face. Mr. Burchette and Mr. Bonds both testified that the shooter had a tattoo or distinguishing marks under his right eye, which was consistent with the two teardrop tattoos under Defendant's right eye. We also note that Mr. Burchette testified that Derrick Fifer, Defendant's brother, was his distant cousin, and they were "hanging out" on the day of the shooting.

As pointed out by the State, the trial court did not apply an incorrect legal standard, reach an illogical result, or base its ruling on a clearly erroneous assessment of the evidence as argued by Defendant in his brief. The trial court has broad discretion to control the duration and scope of closing arguments. *Middlebrooks*, 995 S.W.2d at 557. Defendant is not entitled to relief on this issue.

Finally, Defendant contends:

> [O]ne of the most severe and significant limitations that the trial court placed on the defendant is when it allowed the State to represent to the jury, over the defendant's objection, that the defendant had the nickname of "Boogie," and that this nickname was concluded to be the defendant's nickname after it was researched and developed through some database."

Although the State addresses this issue under prosecutorial misconduct in its brief, it does not appear that Defendant makes that specific argument in his brief. He simply argues that the trial court erred by allowing the State to make the statement in its closing argument. "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 130. "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id*. at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.*

In this case, the following exchange took place during the State's rebuttal closing argument:

> [Prosecutor]: You heard Officer Taylor talk about - - Israel Taylor talking about he didn't tell us a lot. And Marquette Burchette told you on the witness stand, he said I lied because I didn't see tattoos on the

arms. I didn't see green shirts, green hat. Why? Scared. He's scared. Did he tell you why he came back and told you the truth when the cops came back down to him and talked to him further, talked to him further that same day. Because he found out [the victim] is dead. It meant more. Somebody died. Because he wanted forty dollars of cocaine for free. Somebody died. [The victim]. Father of seven, died because he wanted forty dollars [of] cocaine for free. To take. Remember, racks. They're going to take by any means. He and Derrick. That's why it became more serious.

And he told the police what happened. He told the police I know Derrick Fifer. He [set] it up. He thinks he did. And I seen a guy that's been with him. I don't know him. He's been around. I think he's his cousin or something. Know him as Boogie. And Boogie the days before had talked about that. Robbing people. And I knew it. When I saw Boogie approach the van, I knew it was bad, [Defendant] approached the van, I knew it was bad. That's what happened. That's why he didn't answer why he was in the van. He just figured out what was about to go down.

So then he told them Boogie.

So now what do the cops do? They didn't just invent Boogie in the air. They didn't just make it up. They took that name. Researched it and guess what they came back with?

[Defense Counsel]:        Your Honor, may we approach?

THE COURT:        Sure.

*        *        *

[Defense Counsel]:        That's not in evidence. Not in evidence ever.

[Prosecutor]:        They testified they got the name Boogie. They researched it and it came back to the address. It matched.

THE COURT:        That's what I recall.

[Defense Counsel]:        They said they got it from Marque.

[Prosecutor]:        They got the name from Marque. And then they took that - -

- 17 -

THE COURT: And then they went through looking for who Boogie is. I think that was testified to. And so I'm going to overrule your objection.

\* \* \*

[Prosecutor]: So they took that name, the officers took the name Boogie, who now Marque Burchette is scared because somebody he knows has died because of this robbery, it's more serious. They took that name Boogie, researched it, and guess what? It comes back to [Defendant].

[Defendant] comes back to that same address. There are linking dots here? Making it simpler here? They take that information and go, well, we're not going to just rely on Marque Burchette because he was wasn't really forthcoming the first time. And he actually told you all he didn't tell the truth.

So we don't just go arrest [Defendant] at that point. We go back to Anwan Bonds who gave a description, which guess what? His description he gave on the scene before he learned who Boogie is or Courtney Fifer is, guess what matches [Defendant]?

So they go back to - - the next day, the 18th, they go back to Anwan Bonds, and go, we think we have a suspect. Look at this, do you see the person. And you heard how confident he was when he made that identification. That man. [Defendant].

Don't judge me. You heard him testify how confident he was every time they tried to dissuade him of his identification.

Identified his name. Didn't know his name at that point. Didn't know him as Boogie, didn't know anything. He's just a guy who walked up, talked about the drugs, leaned in and shot his best friend.

Think about how close he was sitting to this man? Think how that would be etched in your memory the rest of your life? The eyebrows, the face, the eyes, the body style, what appeared to be tattoos or moles or something on the face, the right side of the face. Which he has.

Identified him.

The State indicated to the jury that the name "Boogie" was obtained from Mr. Burchette rather than it "was concluded to be the defendant's nickname after it was researched and developed through some database," as argued by Defendant in his brief.

- 18 -

The State clearly argued that the nickname was obtained from Mr. Burchette and then police "researched" and made additional efforts to verify that Defendant and "Boogie" where the same person by comparing the description of the shooter to the description provided by Anwan Bonds. The State also noted that "[Defendant] comes back to that same address." At no time did the State argue that the nickname "Boogie" was researched and developed from a database. We point out that this argument appears to be in response to defendant's closing argument during which defense counsel said: "And what did the police officer say? And this is to tell you how the police officer said, well, we developed the nickname of Boogie. That's not developing the nickname. Somebody said to you that was the nickname and you ran with it. You didn't double check it, cross reference it, anything."

The State did not misstate the evidence, and the trial court did not abuse its discretion by allowing the State to argue to the jury that Defendant's nickname was "Boogie" and how police went about verifying Defendant's nickname. Defendant is not entitled to relief on this issue.

## CONCLUSION

We affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE