IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 12, 2021 Session

## STATE OF TENNESSEE v. TRENTON JERMAINE BELL

**Appeal from the Criminal Court for Wilson County**
**No. 15-CR-216     Brody N. Kane, Judge**

_____

### No. M2019-01810-CCA-R3-CD

_____

Trenton Jermaine Bell, Defendant, was arrested and charged with first degree premediated murder, tampering with evidence, and abuse of a corpse in connection with the death of the victim, Sydney Green. A Wilson County jury convicted Defendant as charged on all counts, and the trial court sentenced Defendant to an effective life sentence. On appeal, Defendant argues that the trial court committed plain error by failing to issue a curative instruction when a police detective offered improper lay testimony. He also contends that the evidence was insufficient to support his conviction for first degree premeditated murder and that he was denied a jury venire comprising a fair cross section of the community. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Kendall F. Stivers, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); Kelly Thompson, District Public Defender; and Kelly Skeen and D.J. Jones, Assistant District Public Defenders, Lebanon, Tennessee (at trial), for the appellant, Trenton Jermaine Bell.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and James M. Lea, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

On the morning of trial, Defendant filed a Motion in Limine for a Representational Jury Venire. He argued that Wilson County comprised 7.1% African-American residents and moved the court to ensure that the venire was composed of a minimum of 7.1% African-Americans.[1]

After the trial began, during a jury-out hearing, the trial court took up Defendant's Motion in Limine for a Representational Jury Venire. Ms. Debbie Moss, the Criminal Court Clerk for Wilson County, testified that jury pools were selected from those who had state "ID's." She said that the only exclusions from the jury pool were for people who had a "handgun carry permit," those who were deceased, those who moved out of state, and those under the age of eighteen. She stated that the clerk's office kept reports for the racial composition of every jury pool. Ms. Moss explained that, for the last three jury pools, "[o]ne was a six-point-something and one was a five-point-something" percent African-American. Ms. Moss agreed that, for the year preceding Defendant's trial, the jury pools' percentage of African-American representation fell below the Wilson County African-American population percentage.

At trial, Ms. Sherrele Green testified that she was the victim's mother and that the victim was nineteen years old in February 2015. Ms. Green stated that the victim attended college and worked in fast food restaurants to support herself. She said that the victim was in a college sorority and was active on her college campus. Ms. Green recalled that the victim and Defendant used to "date" intermittently for about a year to a year and a half.

Lebanon Police Department ("LPD") Officer Cody Bryan testified that he was a patrol officer in February 2015 and that he responded to a call for a "possible suicide attempt" on February 17, 2015. When Officer Bryan arrived at the scene around midnight, Defendant told him that the victim was in the bathroom and that she had been in there for approximately four hours. Defendant told Officer Bryan that he tried to kick the bathroom door open but that he was unable to make entry. Officer Bryan testified that he kicked a hole in the bathroom door and forced entry. Officer Bryan explained that the victim was lying unclothed and face down in a bathtub full of water and that the bathtub faucet was still running, overflowing the bathtub. Officer Bryan saw two medicine bottles in the bathtub, which he later discovered were one bottle for folic acid and one bottle for allergy medicine. He "turned the water off, reached in, [and] grabbed her." Officer Bryan and Officer Beth Taylor continued CPR until paramedics from Wilson County Emergency

---

[1] No oral or written ruling on this motion from the trial court appears in the record on appeal.

Management Agency ("WEMA") arrived. Officer Bryan stated that he gave the bottles from the bathtub to WEMA. Officer Bryan then overheard Defendant tell Detective Eugene McGee that the victim "us[ed] a knife" which was "somewhere on the couch." Officer Bryan collected a knife he found on the couch and placed it into evidence.

Kevin Boston testified that he went to high school and college with Defendant and that they were friends and had been roommates in the past. Mr. Boston testified that he had previously witnessed arguments between Defendant and the victim but that he had never seen their disputes turn violent.

Mr. Boston recalled that Defendant called him on the night of February 17, 2015, saying that he "needed a friend" because the victim was in the bathroom trying to commit suicide. Mr. Boston told Defendant to break into the bathroom and stop her, and they ended the phone call.

Later that night, Defendant called Mr. Boston, again saying he "needed a friend," and asked Mr. Boston to come to the victim's apartment. After Mr. Boston arrived at the victim's apartment, Mr. Boston and Defendant "kne[lt] and prayed." Defendant then told Mr. Boston that he killed the victim. Mr. Boston "didn't feel safe," so he convinced Defendant to leave the apartment." They walked for approximately two miles back to Mr. Boston's apartment, and Defendant told Mr. Boston that he and the victim had been in a dispute. Defendant told Mr. Boston that "one thing led to another" and that he "choked" the victim and then made it appear as though she committed suicide. Mr. Boston did not recall Defendant's mentioning a knife. After Defendant left Mr. Boston's apartment, Mr. Boston called the police.

Mr. Boston read his written statement into the record, which stated, in part, "[Defendant] staged the suicide to make [it] look like she took pills and drowned. He choked her and didn't seem like he was sorry about it. . . . [Defendant] was thinking about leaving the state but he had to get some things out of the apartment."

On cross-examination, Mr. Boston testified that, while Defendant and the victim were dating, he saw "passionate love" between them. Mr. Boston agreed that the victim had some mental issues and that she attempted suicide in 2014. Mr. Boston stated that he told police that "this [was] not the [Defendant] that [he knew]." Mr. Boston recalled that Defendant talked about the victim "hitting" Defendant during the altercation on the night she was killed and that the victim was trying to "kick [Defendant] out."

LPD Detective Eugene McGee testified that he was called to the victim's apartment on the night of February 17, 2015. Detective McGee recalled that Defendant told him that, when the victim arrived home that evening around 8:00 p.m., the victim saw Defendant

texting with another girl, so the victim locked herself in the bathroom and threatened suicide. Defendant told Detective McGee that the victim was in the bathroom for approximately an hour before he called the police. Defendant told Detective McGee that he tried to contact the victim while she was in the bathroom via phone call and text message, and Defendant showed Detective McGee some text messages. The text messages were requests for the victim to come out of the bathroom and speak with Defendant.

Detective McGee testified that the victim texted Defendant at 8:30 p.m. from a movie theater about when she would be home, so Detective McGee realized Defendant's timeline was incorrect. Detective McGee noticed a scratch on Defendant's temple and scratches on his hands, and Defendant told him that "their arguing got a little physical" and that the victim tried to grab the phone from him. Defendant told Detective McGee that the victim grabbed a knife and demanded to see his phone but that Defendant would not give her his phone. Detective McGee explained, "[Defendant] ke[pt] adding to his story while I [was] talking to him." Detective McGee testified that no fingerprints were found on the knife recovered from the scene.

Detective McGee stated that Mr. Boston had given a written statement to police the morning after the murder. When Detective McGee learned of the statement, he asked Defendant to come in for further questioning, and Defendant complied. When Defendant arrived at the police station, officers photographed Defendant's injuries, and then Detective McGee interviewed Defendant. On the video of the interview, the following exchanges occurred:

> [DETECTIVE MCGEE]: I've wrestled and [I've done] all that kind of stuff before and I understand that sometimes you go a little bit harder than you mean to and bad things happen. . . . At some point, you grabbed her in such a way that she went limp.
>
> [DEFENDANT]: She did go limp.
>
> [DETECTIVE MCGEE]: And she was unconscious, right?
>
> [DEFENDANT]: (nods)
>
> . . . .
>
> [DETECTIVE MCGEE]: Did you have an arm around her neck?
>
> [DEFENDANT]: The arm came around her neck a couple times.

- 4 -

[DETECTIVE MCGEE]: Do you think you maybe had her in a hold like this for a certain amount of time and you didn't realize [it]? . . . .

[DEFENDANT]: [T]hat could have been a possibility, that I held her a little bit too long.

. . . .

[DETECTIVE MCGEE]: The reason you don't do choke holds in wrestling -- why?

[DEFENDANT]: `Cause you don't want nobody on the mattress to be unconscious.

On cross-examination, Detective McGee explained that Officer David Wilmore conducted the fingerprint analysis at the LPD lab three years after the victim's death and that the knife was not sent to the Tennessee Bureau of Investigation for analysis. Detective McGee stated that the knife was not tested for DNA evidence. He said that the pills and the bottles found in the bathtub were not tested. He explained that it was after he spoke to the medical examiner that he decided that Defendant needed to come in for additional questioning. He testified that Defendant had "a blank stare" when they spoke on the night of the victim's death and on the following day at the police station. Detective McGee explained that Mr. Boston's written statement was corroborated by the determination from the medical examiner's office that the victim died by "strangulation."

LPD Lieutenant Scott Massey testified that he had been in law enforcement for twenty-eight years. He recalled interviewing Defendant at the police station on February 18, 2015, following Defendant's interview with Detective McGee. Lieutenant Massey read Mr. Boston's statement to Defendant. During the interview, the following exchanges occurred:

[LIEUTENANT MASSEY]: Tell me what happened[.]

[DEFENDANT]: [The victim] seen [sic] the texts on the phone, and she said, "You can't disrespect me in my own house" because I was texting [another woman]. She got mad because I wouldn't give her my phone. So she tried to get it from me, [and] I wouldn't let her get it from me. She ended up punching me in the face, and then she got the knife. And then I choked her. She said she was [going to] stab me, and she said that she was [going to] call somebody. I don't know who, I mean, she said she was [going to] call somebody. So, I mean, I choked her. And then she was unconscious for too

long. . . . Then I didn't know what to do. I freaked out; I panicked. I didn't mean -- I didn't mean to kill her. I was just trying to stop her from trying to hurt me. But I realized that she wasn't moving. She was just -- [I] tried to make it look like -- just trying to make it look like an accident.

[LIEUTENANT MASSEY]: What did you do to try to make it look like an accident? What did you do?

[DEFENDANT]: Put her in the tub.

[LIEUTENANT MASSEY]: And then what?

[DEFENDANT]: Turned the water on.

[LIEUTENANT MASSEY]: Did you put her face down in the bathtub?

[DEFENDANT]: Yes.

[LIEUTENANT MASSEY]: What did you do with the pills that were in the bottle? Tell me the truth. There were two prescription bottles in there. What'd you do with them?

[DEFENDANT]: There were three; I put some in the tub.

. . . .

[LIEUTENANT MASSEY]: [A]t one point, while she was screaming, you covered her mouth because you were afraid the neighbors were going to hear, right?

[DEFENDANT]: Yes.

[LIEUTENANT MASSEY]: [W]as she screaming while you were choking her?

[DEFENDANT]: Yes.

Lieutenant Massey then read Defendant's written statement to the jury, which was substantially similar to the details given in his interview. The video of the interview resumed for the jury, and the following exchange occurred after Defendant wrote his statement:

[LIEUTENANT MASSEY]: If you're choking her, and you cover her mouth, where's the hand that stops the knife from swinging?

[DEFENDANT]: She had already let go of the knife.

[LIEUTENANT MASSEY]: [S]he had dropped the knife, and you were choking her and covering her mouth because she was screaming?

[DEFENDANT]: Yes.

LPD Detective Jason Bringhurst stated that one of his job duties was "cell phone forensics." Detective Bringhurst explained that he had training in two platforms that downloaded information from phones and tablets. He stated that he downloaded information from Defendant's phone and that he conducted a manual inspection of the phone, including "notes, memos, pictures and text messages." Detective Bringhurst found a "note" on Defendant's phone titled "Stickin2it," which was dated February 16, 2015. Detective Bringhurst said that February 16, 2015, was either the "creation date" of the note or the "last modified date" of the note. Detective Bringhurst read the note entitled "Stickin2it" to the jury:

> She said she was cold and was about to take a bath. I heard a bump and thought it was the neighbors. After a while I didn't hear anything so I went to knock on the door. There's a sound of water running still and water started coming out from under the door. I beat on the door but there was no answer so I tried to open it. The door was locked and I still [heard] no sound but water running so I called the police. (History of suicidal tendencies.)

On cross-examination, Detective Bringhurst stated that there were two notes on the phone that followed the "Stickin2it" note; the notes were dated February 18, 2015, at 5:56 p.m. and at 7:09 p.m. Detective Bringhurst agreed that, from 5:56 p.m. to 7:09 p.m. on February 18, 2015, when the last two notes were "created or modified," Defendant was in custody and did not have his phone. Detective Bringhurst explained:

> So the way that this note presents time is what is called epoch Unix time which is the number of seconds from January 1, 1970. This particular note calculates those notes in milliseconds, so currently at that point in time we fall back so we were six hours behind [universal time code ("UTC")] time which is what that is calculated from.

So this time calculation in here calculates it to UTC time. We, at that point, as six hours behind UTC time. So that time at 8:09 p.m. would actually be 2:09 p.m.

[DEFENSE COUNSEL]: So you're saying the time on here is not correct?

[DETECTIVE BRINGHURST]: Six hours prior to that would be current local time. That time is correct for UTC, universal time code.

On redirect examination, Detective Bringhurst testified that the UTC time stamps on the notes were correct but that local time was "six hours behind that time period," requiring Detective Bringhurst to "subtract the six hours to get the current local time." Upon objection from defense counsel to lay opinion testimony, the trial court stated that the State "need[ed] to lay some more ground work to see if [Detective Bringhurst] is qualified about UTC. He might be but . . . I'm not satisfied as of now that he is." Detective Bringhurst was asked no further questions.

Dr. Miguel Laboy testified as an expert witness in forensic, anatomic, and clinical pathology. He said that he was a medical examiner in Nashville and that he performed the autopsy on the victim. Dr. Laboy explained that the victim was five feet, two inches tall and weighed 110 pounds. He said the victim had petechiae, which were "dots" on the white parts of her eyes and inside her lips that were "hemorrhaged." Dr. Laboy stated that petechiae occur "mainly with some kind of pressure on the neck[.]" He said that the victim had a hemorrhage on the muscle that constricts the windpipe. Dr. Laboy said that the victim's toxicology report showed that there were no detectable drugs in her system. Due to these indications, Dr. Laboy stated that the victim died of asphyxia. He said that someone choked the victim for likely four to six minutes.

On cross-examination, Dr. Laboy agreed that petechiae can occur from CPR and that he did not know how long the victim received CPR. He agreed that the victim's lungs were "congested" and that he could not rule out that the congestion was due to water in the lungs. He agreed that his report indicated "frothy fluid" in the trachea and that this can be seen in cases with drownings, overdoses, and CPR. He agreed that, if a choke hold was released and a person regained consciousness, a person could later pass out again.

The jury found Defendant guilty of first degree premeditated murder in count one, tampering with evidence in count two, and abuse of a corpse in count three. The trial court sentenced Defendant to life for count one, six years' incarceration with a thirty percent release eligibility in count two, and two years' incarceration with a thirty percent release eligibility in count three, all counts to run concurrently, for an effective life sentence. Defendant filed a timely Motion for New Trial in which he argued several issues, including

that there was insufficient evidence to support the verdicts and that the trial court committed reversible error by denying Defendant's Motion in Limine for a Representational Jury Venire. The trial court denied the motion, and Defendant timely appeals.

## Analysis

On appeal, Defendant argues that the trial court committed plain error by failing to issue a curative instruction when a police detective offered improper lay testimony. He also contends that the evidence was insufficient to support his conviction for first degree premeditated murder and that he was denied a jury venire comprising a fair cross section of the community.

### *Curative Instruction*

Defendant argues that the trial court committed plain error by failing to give a curative instruction to the jury to disregard Detective Bringhurst's lay opinion testimony regarding the UTC calculation for the note "Stickin2it." The State responds that Defendant has failed to show plain error because no clear and unequivocal rule of law was breached.

After defense counsel's objection during the redirect examination of Detective Bringhurst, the trial court agreed that there was no foundation to support Detective Bringhurst's testimony as an expert regarding the UTC time calculations. However, Defendant did not request a curative instruction. "[A] defendant is not entitled to relief when he or she 'failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.'" *State v. Debiasi Sirnard King*, No. E2002-00634-CCA-R3-CD, 2003 WL 21261775, at *4 (Tenn. Crim. App. June 2, 2003) (quoting Tenn. R. App. P. 36(a)), *perm. app. denied* (Tenn. Oct 27, 2003). "When a defendant fails to request a curative instruction, he waives the issue on appeal." *See State v. Jones,* 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). Defendant concedes that the issue is waived, but he asks this court to review his claim under plain error.

"[W]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error review, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not

waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, no clear and unequivocal rule of law was breached. On cross-examination, defense counsel elicited the following testimony from Detective Bringhurst:

> [DETECTIVE BRINGHURST]: So the way that this note presents time is what is called epoch Unix time which is the number of seconds from January 1, 1970. This particular note calculates those notes in milliseconds, so currently at that point in time we fall back so we were six hours behind [universal time code ("UTC")] time which is what that is calculated from.
>
> So this time calculation in here calculates it to UTC time. We, at that point, as six hours behind UTC time. So that time at 8:09 p.m. would actually be 2:09 p.m.
>
> [DEFENSE COUNSEL]: So you're saying the time on here is not correct?
>
> [DETECTIVE BRINGHURST]: Six hours prior to that would be current local time. That time is correct for UTC, universal time code.

On redirect examination, Detective Bringhurst testified that the UTC time stamps on the cell phone notes were correct but that local time was "six hours behind that time period," requiring Detective Bringhurst to "subtract the six hours to get the current local time." Defendant objected to Detective Bringhurst's testimony on redirect examination. However, the testimony Defendant elicited on cross-examination is virtually identical to the testimony to which he objected. In fact, once Detective Bringhurst began discussing UTC time calculations during cross-examination, defense counsel continued to ask him questions to clarify his opinion, and he elicited far more information on cross-examination than the State elicited on redirect. "A defendant cannot be heard to complain about incompetent evidence he elicits by cross-examination." *Pulley v. State*, 506 S.W.2d 164, 168 (Tenn. Crim. App. 1973). Defendant had no right to complain of the responsive testimony he elicited with his own questioning; thus, the trial court did not err when it did not *sua sponte* deliver a curative instruction. Thus, Defendant is not entitled to plain error relief.

- 10 -

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his conviction for first degree premeditated murder. He argues that, had the trial court instructed the jury to disregard Detective Bringhurt's testimony regarding the time stamp on the note "Stickin2It," the evidence would not have supported that the victim's murder was an intentional or premeditated act. Defendant did not appeal his conviction for tampering with evidence or abuse of a corpse.

The State responds that the evidence was overwhelming that this was an intentional and premeditated murder.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2015). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2015). Premeditation "is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (2015). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

- 11 -

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.* Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Here, the evidence shows that Defendant strangled the victim and that she died from her injuries. Dr. Laboy testified that the victim had bruising on her neck and petechiae in her eyes and lips consistent with strangulation. Defendant stated in his police interview that he choked the victim until she went limp and then placed her in the bathtub to make it look like a suicide.

There is also ample evidence that Defendant premeditated the murder. First, Defendant wrote a note on his cell phone the day before the murder, detailing the story he would give to police after the murder. Even if the testimony of Detective Bringhurst was improper, this court reviews all the evidence considered by the jury for a sufficiency challenge, whether properly admitted or not. *State v. Long*, 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000). Further, Defendant staged the murder scene to appear as a suicide. He admitted in his interview that he choked the victim until she "went limp" and that he was covering her mouth while he choked her to keep the neighbors from hearing her screams. His attempts to conceal the murder, both during its commission and after its completion, are evidence of premeditation. *State v. Trusty*, 326 S.W.3d 582, 596 (Tenn. Crim. App. 2010) (stating that evidence of premeditation included that the defendant "went to elaborate efforts to dispose of the victim's body and to conceal evidence of the crime rather than seeking immediate medical assistance or reporting her alleged accidental death to the police"); *State v. Caldwell*, 671 S.W.2d 459, 463 (Tenn. 1984). Finally, Defendant appeared completely calm after the killing. He admitted that it took him an hour to call the police after he placed the victim in the bathtub, and he showed no emotion throughout his discussion with the detectives. Defendant also told Mr. Boston that he killed the victim, and Mr. Boston stated that Defendant "didn't seem like he was sorry about it." *See Suttles*, 30 S.W.3d at 261 (stating that calmness after the killing can be evidence of premeditation). The evidence was sufficient to support the verdict for first degree premeditated murder, and Defendant is not entitled to relief.

Defendant argues that, because African-Americans comprise 7.1% of the population of Wilson County and because only three African-Americans were in Defendant's jury venire of 113 potential jurors, Defendant was denied a jury venire which represented a fair cross section of African-Americans of the community.

The State responds that Defendant has not established a prima facie case that African-Americans were systematically excluded from the jury venire.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. Am. VI.  "[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community."  *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). The United States Supreme Court explained that drawing a jury from a "fair cross section of the community" requires that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."  *State v. Hester*, 324 S.W.3d 1, 39 (Tenn. 2010) (quoting *Taylor*, 419 U.S. at 538).  To "establish a prima facie violation of the fair cross section requirement," however, a

> defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*State v. Davidson*, 509 S.W.3d 156, 237 (Tenn. 2016) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

Here, Defendant has not shown a systematic exclusion of African-Americans from the Wilson County jury pool.  Ms. Moss stated that, in the year prior to Defendant's trial, one jury pool had "five point something" percent African-Americans and another jury pool had "six point something" percent African-Americans.  While Defendant asserted in his motion in limine that 7.1% of Wilson County was African-American, no proof appears in the record regarding what percentage of the community was African-American.  *See State v. Stephens*, 264 S.W.3d 719, 733 (Tenn. Crim. App. 2007) ("No proof was offered regarding the population figures of Fentress County or the residency breakdown of the prospective jurors."), *abrogated on other grounds as stated in State v. Randall T. Beaty*,

No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at \*20 (Tenn. Crim. App. July 8, 2016), *perm. app. granted* (Tenn. Oct. 19, 2016); *see also Trotter v. State*, 508 S.W.2d 808, 809 (Tenn. Crim. App. 1974) (stating that counsel's arguments are not evidence). Moreover, Ms. Moss testified that the jury pool was selected from those with state "ID's" and that the only persons who were excluded from the jury pool were those who had a handgun carry permit, those who had died, those who had moved out of the state, and those under the age of eighteen. Random selection of a jury pool from state identification cards is not systemic exclusion. *State v. Shanthony Tywon Mays*, No. W2016-01390-CCA-R3-CD, 2017 WL 3841372, at \*9 (Tenn. Crim. App. Aug. 31, 2017), *perm. app. denied*. (Tenn. Jan. 23, 2018). Defendant has not established a prima facie violation of the fair cross section requirement and is not entitled to relief. *See Davidson*, 509 S.W.3d at 237; *see also Josh L. Bowman v. State*, No. E2016-01028-CCA-R3-PC, 2017 WL 1449232, at \*8 (Tenn. Crim. App. Apr. 24, 2017), *perm. app. denied* (Tenn. Aug. 16, 2017).

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE